## MATTER OF LEON-OROSCO AND RODRIGUEZ-COLAS

### In Exclusion Proceedings

A-23215742
A-24790678

. *Decided by Board November 30, 1983*
*Decided by Attorney General July 27, 1984*

(1) A motion to reopen exclusion proceedings for the purpose of applying for asylum and withholding of deportation will not be granted where a prima facie case of eligibility for such relief has not been established, the alien has not reasonably explained his failure to assert his asylum claim prior to completion of his exclusion hearing, or the immigration judge is not satisfied that the evidence sought to be offered is material, was not available, and could not have been discovered or presented at the time of the original hearing.

(2) Notwithstanding a clear showing of prima facie eligibility for the underlying relief sought, a motion to reopen proceedings can be denied for discretionary reasons where, for example, the record reflects little likelihood of success on the merits if reopening is permitted.

(3) Notwithstanding the submission of extensive documentation in support of the motion to reopen proceedings and assuming arguendo, that as a Mariel participant, the applicant is a member of a "particular social group," he has not made a prima facie showing that his life or freedom would be threatened or that he will be persecuted or has a well-founded fear of persecution if returned to Cuba based on that membership.

(4) The refusal of a country to accept the return of its nationals does not, by itself, provide the basis for an asylum claim.

(5) Recognizing that a failure to address the effect of a stipulation between the parties is not a rejection of it, the Attorney General found nothing in the Board of Immigration Appeals' statement which precluded the parties from abiding by the stipulation and permitting it to govern their conduct; inasmuch as the stipulation dealt with the subsequent effect of test cases on other parties not presently before the Board, the Attorney General determined that it was not necessary for the Board to discuss the stipulation's effect and not inappropriate to defer doing so until it was faced with a case in which the terms of the stipulation were material to the resolution of a controversy.

(6) The Attorney General found no error in the Board's refusal to provide an exegesis on the phrase "membership in a particular social group," where reaching that issue was not necessary in resolving the case and would have, under the circumstances, represented an advisory opinion on an issue that, while important, did not need to be resolved by the Board.

136

EXCLUDABLE: Act of 1952—Sec. 212(a)(9) [8 U.S.C. § 1182(a)(9)]—Crime involving moral turpitude (both applicants)

Sec. 212(a)(20) [8 U.S.C. § 1182(a)(20)]—No valid immigrant visa (both applicants)

ON BEHALF OF APPLICANTS:
Deborah S. Ebel, Esquire
1131 Capitol Avenue, S.W.
Atlanta, Georgia 30315
(Leon-Orosco)

Dale Schwartz, Esquire
Myron Kramer, Esquire
Troutman, Sanders, Lockerman & Ashmore
Chandler Building, Suite 1400
127 Peachtree Street, N.E.
Atlanta, Georgia 30305
(Rodriguez-Colas)

ON BEHALF OF SERVICE:
Michael J. Heilman
Deputy General Counsel

Kendall Warren
Acting Appellate
Trial Attorney

## BEFORE THE BOARD

### (November 30, 1983)

BY: Milhollan, Chairman; Maniatis, Dunne, Morris, and Vacca, Board Members

## MATTER OF LEON-OROSCO

The applicant appeals from the August 16, 1982, decision of the immigration judge denying his motion to reopen exclusion proceedings. Oral argument was heard before the Board on March 16, 1983. The appeal will be dismissed.[1]

The applicant is a 41-year-old native and citizen of Cuba. He was part of the massive exodus from that country in the spring of 1980, arriving at Key West, Florida, on May 31, 1980. At an exclusion hearing conducted on December 4, 1980, an immigration judge found the applicant excludable under section 212(a)(20) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(20) (1982), denied

---

[1] The applicant in the present case and the applicant in a companion case, Pascual Rodriguez-Colas (A24 790 678), decided this date, are members of a designated class of Mariel Cubans. See Fernandez-Roque v. Smith, 539 F. Supp. 925 (N.D. Ga. 1982). Counsel for the Immigration and Naturalization Service and the applicants have stipulated that the Board's decisions in these cases shall be binding on all such similarly situated Mariel Cubans with respect to asylum claims based on membership in a particular social group. The effect of this stipulation on the Board or immigration judges need not be addressed in the matter now before us. Jurisdiction over such motions to reopen, however, is clearly with the Board or the immigration judges. 8 C.F.R. §§ 3.2, 242.22 (1984).

his request for asylum, and ordered him excluded and deported. No appeal was taken from this decision.

On June 15, 1982, the applicant filed a motion to reopen exclusion proceedings for the purpose of applying for asylum [2] based on his claim that as a participant in the 1980 Mariel Freedom Flotilla he is a member of a "particular social group," with a well-founded fear of being persecuted as a result of that membership if returned to Cuba. The motion was supported by documentary evidence, including affidavits, statements, and publications issued by United States Government agencies and officials, and the deposition of Jorge I. Dominguez, a professor of government at Harvard University.

The applicant states in his motion that he has a well-founded fear of being subject to persecution should he be returned to Cuba, solely because he is a member of the 1980 Freedom Flotilla. His claim is based on the Castro regime's attitudes and policies directed at the Mariel participants as a group. He explains that "once the vast number of Cubans came forward and expressed their desire to leave Cuba via Mariel, their status in the eyes of the Cuban Government became identical." They were viewed as "scum" and responsible for the failure of the Government's economic and social programs. He further states that the treatment of the Mariel participants, both those who departed Cuba and those left behind, the punishment of those nationals who sought to voluntarily return, and the testimony of Professor Dominguez clearly establish the existence of a "particular social group," the applicant's membership in that group, and a well-founded fear of persecution based on that membership if returned to Cuba.

The immigration judge concluded that the applicant had not established prima facie that the Mariel Cubans constituted a particular social group or his membership in such a group. On appeal, the applicant submits that the immigration judge's denial of the motion is contrary to the law and that he erroneously concluded that the Freedom Flotilla was not a particular social group for asylum purposes. He also submits that it was error to conclude that the applicant would not suffer the same degree of persecution experienced by the Cuban nationals who sought to voluntarily return to Cuba.

---

[2] An application for asylum under section 208(a) of the Act, 8 U.S.C. § 1158(a) (1982), shall also be considered as a request for withholding of exclusion or deportation pursuant to section 243(h) of the Act, 8 U.S.C. § 1253(h) (1982). 8 C.F.R. § 208.3(b) (1983).

A party seeking to reopen exclusion proceedings must state the new facts which he intends to establish, supported by affidavits or other evidentiary material. 8 C.F.R. § 103.5 (1983). A motion to reopen for the purpose of applying for asylum and withholding of deportation will not be granted where a prima facie case of eligibility for such relief has not been established or the alien has not reasonably explained his failure to assert his asylum claim prior to the completion of his exclusion hearing. Nor will it be granted unless the immigration judge is satisfied that the evidence sought to be offered is material, was not available, and could not have been discovered or presented at the time of the original hearing. 8 C.F.R. § 208.11 (1983); INS v. Wang, 450 U.S. 139 (1981); Matter of Martinez-Romero, 18 I&N Dec. 75 (BIA 1981). Even where a prima facie showing of eligibility for the underlying relief is clearly demonstrated, a motion to reopen can be denied for discretionary reasons, where, for example, the record reflects little likelihood of success on the merits if reopening is permitted. Matter of Reyes, 18 I&N Dec. 249 (BIA 1982); Matter of Rodriguez-Vera, 17 I&N Dec. 105 (BIA 1979).

In order to demonstrate prima facie eligibility for asylum, the applicant bears the burden of showing that he has a well-founded fear of persecution if returned to his native land. See Haitian Refugee Center v. Smith, 676 F.2d 1023 (5th Cir. 1982); Fleurinor v. INS, 585 F.2d 129 (5th Cir. 1978). This language refers to more than the alien's subjective state of mind. He must demonstrate a realistic likelihood that he will be persecuted on account of his race, religion, nationality, membership in a particular social group, or political opinion. For the reasons stated below, we are satisfied that reopening is not warranted and that the motion was properly denied. Our conclusion as to the applicant's underlying asylum claim is the same whether we apply a standard of "clear probability," "good reason," or "realistic likelihood." See Rejaie v. INS, 691 F.2d 139 (3d Cir. 1982).

At the outset, we would note that this appeal comes to the Board under unusual circumstances, including a stipulation that the Board's decision be binding on more than 2,000 possibly similarly situated Mariel Cubans. The applicant's motion to reopen, supported by a lengthy brief and 20 exhibits, contains more than 300 pages, including the 90-page deposition of Professor Dominguez. The parties were granted extensive oral argument both before the immigration judge and this Board on appeal. The record reflects that every opportunity to fully brief and present the motion has been given. Except for the possible live testimony of those witnesses whose affidavits and depositions are contained in the record,

the applicant has not suggested that additional evidence will be submitted should the proceedings be reopened. Nor is there any indication that the testimony of those witnesses would differ from their sworn statements presently a part of the record.

The record contains the affidavits of 13 Cuban nationals who participated in the exodus from that country in the spring of 1980, were paroled into the United States and released to the community, and subsequently attempted to return to Cuba on their own. The affiants neither sought nor obtained permission from the Cuban authorities to return to Cuba. The affidavits reflect that upon arriving in Cuba the affiants were arrested and held incommunicado for 5 months, during which period they were interrogated daily and threatened with physical force. The affiants were ultimately convicted of illegally entering the country. They were then placed in the small boats they had used to travel to Cuba, towed 40 miles from Cuba in the direction of the United States, and set adrift without food, water, or navigational equipment. They were told that they were traitors and enemies of the State and that if they attempted to return to Cuba, they would be imprisoned or executed.

Included in the record are the State Department's 1980[3] and 1981[4] Country Reports on Human Rights Practices ("Country Reports") for Cuba. Between April and September 1980, more than 125,000 Cubans arrived in the United States via an illegal sealift originating from the port of Mariel. The reports indicate that while awaiting permission to depart from Mariel many Cuban nationals were harassed by mobs, subjected to inhumane treatment, and forced to endure severe physical deprivation at the holding camps. These abuses did not continue after authorities suspended the Mariel sealift operation in September 1980. According to Professor Dominguez, Cuban nationals who emigrate are required to terminate their employment, turn in their ration cards, and allow their homes to revert to the government before they can receive an exit permit. The abrupt closure of Mariel in September stranded approximately 200,000 Cubans who had received exit permits but had not yet departed, leaving many of them without jobs, places to live, and dependent on family and friends for their support. The reports also confirm that the Cuban Government has refused to permit the

---

[3] 1980 Country Reports on Human Rights Practices at 397–408, Joint Committee of the Senate and House of Representatives, 97th Congress, 1st Session (1981).

[4] 1981 Country Reports on Human Rights Practices at 396–406, Joint Committee of the Senate and House of Representatives, 97th Congress, 2nd Session (1982).

reentry of Mariel Cubans who have changed their minds and sought to return to Cuba.

Also submitted in support of the applicant's motion was the November 12, 1981, deposition of Professor Dominguez, an expert on Latin American affairs with a special expertise in contemporary Cuban political and military policies. He is a consultant for the State Department regarding Cuba and other Latin American projects and visited Cuba in January 1979 and again in August 1980 as a guest of the Cuban Government. He testified that an intensive crackdown by the Government against opponents of the regime began in December 1979 and that the Mariel sealift took place during this state of repression. He testified that those participating in the Freedom Flotilla provided a useful scapegoat for the Government's economic and social failures during the 70's. He stated that the Government's position was that those who sought to depart via Mariel were "scum," not worthy of being considered Cubans, and had been responsible for the failure of the Government's programs for the last 10 years. It was his opinion that those Cubans who departed via Mariel were deemed enemies of the state and would not be allowed to return. He testified that by August 1980 the intense public verbal and physical abuse previously directed at the Mariel participants was diminishing.

Professor Dominguez further testified that if an agreement was achieved with the Castro regime for the return of the Mariel participants, in his opinion, those so returned would be classified "peligrosidad" (state of dangerousness) and that although most would be guaranteed work, it would not necessarily be consistent with a person's skills or training but rather with what was needed by society. In his view, it would take those so returned 4 to 5 years to be fully integrated into Cuban society and cleansed of the "enemy" taint. He further testified that those Mariel participants who had been released from prison would have to complete, at a minimum, their original sentences upon return to Cuba. Professor Dominguez also stated that the severest penalties and charges of treason were directed towards those nationals who sought to return without government authority rather than Mariel participants who might be returned pursuant to an agreement.

Assuming arguendo, that as a Mariel participant, the applicant is a member of a particular social group, we are not persuaded that the applicant has shown prima facie that he will be persecuted if returned to Cuba based on that membership. Notwithstanding the State Department's Country Reports, the applicant has never claimed, at his exclusion hearing, at his hearing on the motion, or before us on appeal, that he was ever subjected to inhumane treat-

ment while living in Cuba or at the time of his departure from that country. Moreover, the reports and testimony of Professor Dominguez indicate that such treatment abated by August to September 1980. We conclude that the refusal of a country to accept the return of its nationals does not, by itself, provide the basis for an asylum claim. There has been no showing that the applicant's return to Cuba would result in treatment similar to that experienced by the Cuban nationals who sought to enter Cuba's territory without first obtaining its permission in compliance with that country's immigration and customs laws. On the contrary, the testimony of Professor Dominguez clearly suggests that Mariel participants who are returned pursuant to an agreement would not experience treatment similar to those nationals who attempted to illegally reenter Cuba. His testimony further suggests that while Mariel participants so returned would not be comfortable, it would be primarily the result of the economic and social upheaval taking place in Cuba, which affects the entire population, rather than a specifically directed course of persecution.

Our review of the record satisfies us that the applicant has not shown prima facie that his life or freedom would be threatened or that he will be persecuted or has a well-founded fear of persecution. We agree with the applicant that it would be improper to evaluate his motion to reopen based on the possible lawful return of the Mariel participants in the future, and we have not done so. Nor is it appropriate to base the motion, as the applicant has done, on the treatment received by those Cuban nationals who illegally returned to Cuba and on the assumption that any further return of Mariel participants would be without the Cuban Government's consent. Neither the lawful nor unlawful return of the Mariel participants is a present reality. The applicant's motion fails to demonstrate prima facie a present realistic likelihood of persecution. The decision of the immigration judge to deny the motion was proper. Accordingly, the appeal will be dismissed.

**ORDER:** The appeal is dismissed.

## MATTER OF RODRIGUEZ–COLAS

The applicant moves to reopen the exclusion proceedings for the purpose of applying for asylum. Oral argument was heard before the Board on March 16, 1983. The Service opposes the motion. The motion will be denied.[1]

---

[1] The applicant in the present case and the applicant in a companion case, Reynaldo *Leon*-Orosco (A23 215 742), decided this date, are members of a designated class
*Continued*

The applicant is a 23-year-old native and citizen of Cuba. He was part of the massive exodus from that country in the spring of 1980, arriving at Key West, Florida, on May 27, 1980. In a decision dated August 5, 1980, an immigration judge found the applicant excludable under sections 212(a)(9) and (20) of the Immigration and Nationality Act, 8 U.S.C. §§ 1182(a)(9) and (20) (1982), denied his request for asylum, and ordered him excluded and deported. On April 9, 1981, this Board dismissed the applicant's appeal with regard to his excludability under section 212(a)(20) and his request for asylum but sustained the appeal as to his excludability under section 212(a)(9) of the Act.

On June 15, 1982, the applicant filed a motion to reopen exclusion proceedings for the purpose of applying for asylum [2] based on his claim that, as a participant in the 1980 Mariel Freedom Flotilla, he is a member of a "particular social group," with a well-founded fear of being persecuted as a result of that membership if returned to Cuba. The motion is supported by documentary evidence, including affidavits, statements, and publications issued by United States Government agencies and officials, and the deposition of Jorge I. Dominguez, a professor of government at Harvard University.

The applicant states in his motion that he has a well-founded fear of being subject to persecution should he be returned to Cuba, solely because he is a member of the 1980 Freedom Flotilla. His claim is based on the Castro regime's attitudes and policies directed at the Mariel participants as a group. He explains that "once the vast number of Cubans came forward and expressed their desire to leave Cuba via Mariel, their status in the eyes of the Cuban Government became identical." They were viewed as "scum" and responsible for the failure of the Government's economic and social programs. He further states that the treatment of the Mariel participants, both those who departed Cuba and those left behind, the punishment of those nationals who sought to volun-

of Mariel Cubans. See *Fernandez-Roque* v. *Smith*, 539 F. Supp. 925 (N.D. Ga. 1982). Counsel for the Service and the applicants have stipulated that the Board's decisions in these cases shall be binding on all such similarly situated Mariel Cubans with respect to asylum claims based on membership in a particular social group. The effect of this stipulation on the Board or immigration judges need not be addressed in the matter now before us. Jurisdiction over such motions to reopen, however, is clearly with the Board or the immigration judges. 8 C.F.R. § 3.2, 242.22 (1983).

[2] An application for asylum under section 208(a) of the Act, 8 U.S.C. § 1158(a) (1982), shall also be considered as a request for withholding of exclusion or deportation pursuant to section 243(h) of the Act, 8 U.S.C. § 1253(h) (1982). 8 C.F.R. § 208.3(b) (1983).

tarily return, and the testimony of Professor Dominguez clearly establish the existence of a "particular social group," the applicant's membership in that group, and a well-founded fear of persecution based on that membership if returned to Cuba.

A party seeking to reopen exclusion proceedings must state the new facts which he intends to establish, supported by affidavits or other evidentiary material. 8 C.F.R. § 103.5 (1983). A motion to reopen for the purpose of applying for asylum and withholding of deportation will not be granted where a prima facie case of eligibility for such relief has not been established or the alien has not reasonably explained his failure to assert his asylum claim prior to the completion of his exclusion hearing. Nor will it be granted unless the immigration judge is satisfied that the evidence sought to be offered is material, was not available, and could not have been discovered or presented at the time of the original hearing. 8 C.F.R. § 208.11 (1983); *INS* v. *Wang,* 450 U.S. 139 (1981); *Matter of Martinez-Romero,* 18 I&N Dec. 75 (BIA 1981). Even where a prima facie showing of eligibility for the underlying relief is clearly demonstrated, a motion to reopen can be denied for discretionary reasons, where, for example, the record reflects little likelihood of success on the merits if reopening is permitted. *Matter of Reyes,* 18 I&N Dec. 249 (BIA 1982); *Matter of Rodriguez-Vera,* 17 I&N Dec. 105 (BIA 1979).

In order to demonstrate prima facie eligibility for asylum, the applicant bears the burden of showing that he has a well-founded fear of persecution if returned to his native land. *See Haitian Refugee Center* v. *Smith,* 676 F.2d 1023 (5th Cir. 1982); *Fleurinor* v. *INS,* 585 F.2d 129 (5th Cir. 1978). This language refers to more than the alien's subjective state of mind. He must demonstrate a realistic likelihood that he will be persecuted on account of his race, religion, nationality, membership in a particular social group, or political opinion. *See* section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (1982). For the reasons stated below, we are satisfied that reopening is not warranted and that the motion should be denied. Our conclusion as to the applicant's underlying asylum claim is the same whether we apply a standard of "clear probability," "good reason," or "realistic likelihood." *See Rejaie* v. *INS,* 691 F.2d 139 (3d Cir. 1982).

At the outset, we would note that this motion comes to the Board under unusual circumstances, including a stipulation that the Board's decision be binding on more than 2,000 possibly similarly situated Mariel Cubans. The applicant's motion to reopen, supported by a lengthy brief and 20 exhibits, contains more than 300 pages, including the 90-page deposition of Professor Dominguez.

144

The parties were granted extensive oral argument both before the immigration judge in the companion case, and this Board on appeal. The record reflects that every opportunity to fully brief and present the motion has been given. Except for the possible live testimony of those witnesses whose affidavits and depositions are contained in the record, the applicant has not suggested that additional evidence will be submitted should the proceedings be reopened. Nor is there any indication that the testimony of those witnesses would differ from their sworn statements presently a part of the record.

The record contains the affidavits of 13 Cuban nationals who participated in the exodus from that country in the spring of 1980, were paroled into the United States and released to the community, and subsequently attempted to return to Cuba on their own. The affiants neither sought nor obtained permission from the Cuban authorities to return to Cuba. The affidavits reflect that upon arriving in Cuba the affiants were arrested and held incommunicado for 5 months, during which period they were interrogated daily and threatened with physical force. The affiants were ultimately convicted of illegally entering the country. They were then placed in the small boats they had used to travel to Cuba, towed 40 miles from Cuba in the direction of the United States, and set adrift without food, water, or navigational equipment. They were told that they were traitors and enemies of the State and that if they again attempted to return to Cuba they would be imprisoned or executed.

Included in the record are the State Department's 1980 [3] and 1981 [4] Country Reports on Human Rights Practices ("Country Reports") for Cuba. Between April and September 1980, more than 125,000 Cubans arrived in the United States via an illegal sealift originating from the port of Mariel. The reports indicate that while awaiting permission to depart from Mariel many Cuban nationals were harassed by mobs, subjected to inhumane treatment, and forced to endure severe physical deprivation at the holding camps. These abuses did not continue after authorities suspended the Mariel sealift operation in September 1980. According to Professor Dominguez, Cuban nationals who emigrate are required to terminate their employment, turn in their ration cards, and allow their homes to revert to the government before they can receive an exit

---

[3] 1980 Country Reports on Human Rights Practices at 397–408, Joint Committee of the Senate and House of Representatives, 97th Congress, 1st Session (1981).

[4] 1981 Country Reports on Human Rights Practices at 396–406, Joint Committee of the Senate and House of Representatives, 97th Congress, 2nd Session (1982).

permit. The abrupt closure of Mariel in September stranded approximately 200,000 Cubans who had received exit permits but had not yet departed, leaving many of them without jobs, places to live, and dependent on family and friends for their support. The reports confirm that the Cuban Government has refused to permit the reentry of Mariel Cubans who have changed their minds and sought to return to Cuba.

Also submitted in support of the applicant's motion is the November 12, 1981, deposition of Professor Dominguez, an expert on Latin American affairs with a special expertise in contemporary Cuban political and military policies. He is a consultant for the State Department regarding Cuba and other Latin American projects and visited Cuba in January 1979 and again in August 1980 as a guest of the Cuban Government. He testified that an intensive crackdown by the Government against opponents of the regime began in December 1979 and that the Mariel sealift took place during this state of repression. He testified that those participating in the Freedom Flotilla provided a useful scapegoat for the Government's economic and social failures during the 70's. He stated that the Government's position was that those who sought to depart via Mariel were "scum," not worthy of being considered Cubans, and had been responsible for the failure of the Government's programs for the last 10 years. It was his opinion that those Cubans who departed via Mariel were deemed enemies of the State and would not be allowed to return. He testified that by August 1980 the intense public verbal and physical abuse previously directed at the Mariel participants was diminishing.

Professor Dominguez further testified that if an agreement was achieved with the Castro regime for the return of the Mariel participants, in his opinion, those so returned would be classified "peligrosidad" (state of dangerousness) and that although most would be guaranteed work, it would not necessarily be consistent with a person's skills or training but rather with what was needed by society. In his view, it would take those so returned 4 to 5 years to be fully integrated into Cuban society and cleansed of the "enemy" taint. He further testified that those Mariel participants who had been released from prison would have to complete, at a minimum, their original sentences upon return to Cuba. Professor Dominguez also stated that the severest penalties and charges of treason were directed towards those nationals who sought to return without government authority rather than Mariel participants who might be returned pursuant to an agreement.

Assuming arguendo, that as a Mariel participant, the applicant is a member of a particular social group, we are not persuaded that

146

the applicant has shown prima facie that he will be persecuted if returned to Cuba based on that membership. Notwithstanding the State Department's Country Reports, the applicant has never claimed, at his exclusion hearing or before us on appeal, that he was ever subjected to inhumane treatment while living in Cuba or at the time of his departure from that country. Moreover, the reports and testimony of Professor Dominguez indicate that such treatment abated by August to September 1980. We conclude that the refusal of a country to accept the return of its nationals does not, by itself, provide the basis for an asylum claim. There has been no showing that the applicant's return to Cuba would result in treatment similar to that experienced by the Cuban nationals who sought to enter Cuba's territory without first obtaining its permission in compliance with that country's immigration and customs laws. On the contrary, the testimony of Professor Dominguez clearly suggests that Mariel participants who are returned pursuant to an agreement would not experience treatment similar to those nationals who attempted to illegally reenter Cuba. His testimony further suggests that while Mariel participants so returned would not be comfortable, it would primarily be the result of the economic and social upheaval taking place in Cuba, which affects the entire population, rather than a specifically directed course of persecution.

Our review of the record satisfies us that the applicant has not shown prima facie that his life or freedom would be threatened or that he will be persecuted or has a well-founded fear of persecution. We agree with the applicant that it would be improper to evaluate his motion to reopen based on the possible lawful return of the Mariel participants in the future, and we have not done so. Nor is it appropriate to base the motion, as the applicant has done, on the treatment received by those Cuban nationals who sought to illegally return to Cuba and on the assumption that the return of the Mariel participants would be without the Cuban Government's consent. Neither the lawful nor unlawful return of the Mariel participants is a present reality. The applicant's motion fails to demonstrate prima facie a present realistic likelihood of persecution.

We conclude that reopening is not warranted. Accordingly, the motion to reopen will be denied.

**ORDER:** The motion is denied.

## BEFORE THE ATTORNEY GENERAL

### (July 27, 1984)

The Board of Immigration Appeals (Board) has referred these companion cases to the Attorney General for review at the request of the Commissioner of the Immigration and Naturalization Service (INS). 8 C.F.R. § 3.1(h)(1)(iii) (1984). INS has requested the Attorney General to review two issues raised by both decisions—first, whether the Board improperly rejected certain stipulations entered into by the parties and second, whether the Board should have provided an interpretation of the term "membership in a particular social group," 8 U.S.C. § 1101(a)(42), for the future guidance of the parties. Based on a complete review of the record, the Board's action on both of these issues is approved.

I. *Background*

The aliens involved in these two cases are Cuban citizens who arrived in the United States during the Spring of 1980 as part of an exodus of over 120,000 people from the port of Mariel, Cuba. Both were detained upon arrival by INS and are now being held at the Atlanta Penitentiary.[1]

Mr. Leon-Orosco was originally found to be excludable in December, 1980 because he lacked valid entry documents. 8 U.S.C. § 1182(a)(20). His application for asylum was rejected at the same time. He did not appeal his final order of exclusion and deportation. Mr. Rodriguez-Colas was ordered excluded and deported in August, 1980. His request for asylum was also denied. On appeal, the Board affirmed his exclusion under 8 U.S.C. § 1182(a)(20), and the denial of his request for asylum.

By early 1982, attorneys for the detainees believed that they had new evidence indicating that individuals who had participated in the boatlift from Mariel in 1980 were subject to persecution by the Cuban Government. Therefore, in June, 1982, motions were filed in both cases to reopen the exclusion proceedings so that applications could be made for asylum. 8 U.S.C. § 1158(a); 8 C.F.R. §§ 208.3(b)–.11 (1984). The claims were based on the asserted ground that the detainees had "a well-founded fear of persecution" by the Cuban Government based on "membership in a particular social group." 8

---

[1] The detained Cubans, now numbering over a thousand, have sought their release on a number of grounds. *Fernandez-Roque v. Smith*, 567 F. Supp. 1115 (N.D. Ga. 1983) *and Fernandez-Roque v. Smith*, 557 F. Supp. 690 (N.D. Ga. 1982), *rev'd*, Nos. 83-8065, 83-8628 (11th Cir. June 1, 1984). *See also Fernandez-Roque v. Smith*, 539 F. Supp. 925 (N.D. Ga. 1982).

U.S.C. § 1101(a)(42). The social group was identified as all Marielitos.

The immigration judge reviewing Mr. Leon-Orosco's case found that he had not met the burden of establishing that he was a member of a particular social group or that he would be persecuted upon his return to Cuba.[2] The Board affirmed on the ground that he had failed to demonstrate a realistic likelihood of persecution and dismissed the appeal.[3] The Board denied Mr. Rodriguez-Colas' motion to reopen on the same ground.[4]

INS thus prevailed before the Board on the central issue involved in both of these decisions—whether the applicants had presented sufficient evidence on the issue of persecution to warrant reopening their exclusion hearings.[5] Nevertheless, INS has petitioned the Attorney General to review these cases to resolve two issues. First, INS complains that the Board should have approved a stipulation agreed to by the parties regarding the effect of the Board's decision on subsequent cases. Second, it argues that the Board should have provided a full interpretation of the term "membership in a particular social group," 8 U.S.C. § 1101(a)(42), "because the issue was ripe and because of the significance of the issue in the cases at hand." INS Statement in Support of Certification of Decision, at 4. For the reasons discussed below, the Board's action on both of these issues is approved.

## II. *Stipulation*

There are over a thousand Cuban detainees at the Atlanta Penitentiary whose attorneys believe they may be eligible for asylum in this country. In order to facilitate determination of the validity of the detainees' claim that Marielitos were a "social group," 8 U.S.C. § 1101(a)(42), that would be persecuted in Cuba, INS and the detainees' attorneys agreed by stipulation that the *Leon-Orosco* and *Rodriguez-Colas* cases would be test cases. Both sides agreed that the Board's decision in these cases would be binding on all other detainees.[6]

---

[2] *In re Leon-Orosco,* No. A23 215 742—Atlanta (Aug. 16, 1982).

[3] *In re Reynaldo Leon-Orosco,* No. A23 215 742—Atlanta (Nov. 30, 1983).

[4] *In re Pascual Rodriguez-Colas,* No. A24 790 678—Atlanta (Nov. 30, 1983).

[5] Attorneys for the applicants have not requested review of this issue by asking the Attorney General to direct that the Board refer the case to him, 8 C.F.R. § 3.1(h)(1)(i). Thus, the Board's finding on this matter has not been challenged by either side.

[6] The stipulation provides, in relevant part:

*Continued*

INS apparently believes that the Board has rejected this stipulation. "Because the Board has declined to accept the stipulations, the decisions in the two cases apply only to the individuals involved. This means that the issue will have to be reconsidered on a case-by-case basis." INS Statement in Support of Certification of Decision, at 3.[7] A review of the Board's decisions, however, indicates that INS' reading is incorrect. In the first footnote in both cases, the Board says:

> Counsel for the Service and the applicants have stipulated that the Board's decisions in these cases shall be binding on all similarly situated Mariel Cubans with respect to asylum claims based on membership in a particular social group. The effect of this stipulation on the Board or immigration judges need not be addressed in the matter now before us.

Failing to discuss the effect of a stipulation is not a rejection of it. Nothing in the Board's statement precludes the parties from abiding by the stipulation and permitting it to govern their conduct.[8] All that the Board said was that in deciding these two cases it did not need to discuss the effect the stipulation would have on other cases not then before it. This is perfectly proper since enforcement of the stipulation will occur in subsequent cases and then only if INS or the detainees' attorneys attempt to ignore or circumvent it. There is no reason to believe that either side will fail to honor the stipulation or that the stipulation will not be enforced if one side

---

That the decision rendered by the [Board] on applicant's motion to reopen and the decision rendered on the reopening hearing, should the motion be granted, will be binding on all asylum/withholding of deportation issues relating to membership in the Freedom Flotilla as a social group, . . . on the following class of persons: all Cuban nationals who are presently incarcerated at the Atlanta Federal Penitentiary, or who were in the past or will in the future be incarcerated there and who arrived in the United States from Cuba as part of the Freedom Flotilla, and a) who have had final orders of exclusion entered against them by an Immigration Judge, and who have appealed to the BIA, and whose final orders of exclusion have been affirmed on appeal, or b) who have had final orders of exclusion entered against them by an IJ, who have appealed to the BIA and who are waiting for a decision.

*In Rodriguez-Colas,* Stipulations Attached to Applicant's Motion to Reopen Decision of BIA, June 15, 1982, at 1. *See also* Letter to Immigration Judge Williams from Deborah Ebel, Attorney for the Applicant, June 29, 1982, at 2; *In re Leon-Orosco,* Applicant's Brief in Support of Appeal to BIA From Denial of Motion to Reopen, Aug. 30, 1982, at 21 n. 1; *In re Reynaldo Leon-Orosco,* Stipulations Attached to Applicant's Motion to Reopen Decision of Immigration Judge, ¶3, June 15, 1982.

[7] "[R]ejection of the stipulation serves no useful purpose and is in fact calculated to impose unnecessary and significant burdens on both the Service and the aliens involved, as well as immigration judges and the Board itself." *Id.* at 2.

[8] The stipulation will, it can be assumed, be effectuated by the detainees' attorneys when they abide by the Board's rejection of the applicants' motions.

does attempt to renege. *Donovan* v. *Hamm's Drive Inn*, 661 F.2d 316, 317 (5th Cir. 1981); *Brown* v. *Tennessee Gas Pipeline Co.*, 623 F.2d 450, 454 (6th Cir. 1980).

Inasmuch as this stipulation is a bargain between the parties as to the subsequent effect of test cases on other parties not before the Board, and had no effect on the Board's adjudication of the rights of either Mr. Leon-Orosco or Mr. Rodriguez-Colas, it was not necessary for the Board to discuss its effect and not inappropriate for it to defer doing so until it was faced with a case in which the terms of the stipulation were material to the resolution of a controversy. The Board's action is approved.

III. *Interpretation of "membership in a particular social group"*

INS convinced the Board that neither applicant had met the burden of proof necessary to permit reopening of his exclusion hearing. Nevertheless, INS has also asked for review of these decisions because the Board, in arriving at its conclusion, assumed *arguendo* that the Cubans were members of a "particular social group"—Marielitos—rather than deciding the issue.[9] Thus, the Board did not discuss an issue the parties had debated hotly during the course of this litigation—namely, whether Cubans whose only connection with each other is that they left Mariel, Cuba in the Spring of 1980 constitute a "particular social group" within the meaning of 8 U.S.C. § 1101(a)(42).

> The Board has therefore supplied no standard which may be used in considering appeals and motions by the affected persons. This means that the issue will have to be considered on a case-by-case basis, to no useful purpose, as an interpretation of general applicability would enable the Service, the aliens involved, immigration judges and the Board to consider the persecution claims of those similarly situated, without a perpetual re-examination of the issue. . . . The failure to provide an interpretation means that the issue remains open, although both the applicants and the Service presented full arguments on this issue, and it could have, and should have been resolved.

INS Statement in Support of Certification of Decisions, at 4-5.

One response to this entirely legitimate concern over the potential for endless relitigation of the issue whether the Marielitos constitute a social group as defined in the statute is that, to the extent that INS and the detainees' attorneys have entered into a stipulation over the effect of these two cases, the Board's decisions are

---

[9] Assuming *arguendo* that the Marielitos were a social group, the Board found that the evidence presented on behalf of both applicants did not make out a *prima facie* case that Cuba would persecute them. *In re Leon-Orosco*, No. A23 215 742-Atlanta (Nov. 30, 1983), at 5; *In re Rodriguez-Colas*, No. A24 790 678-Atlanta (Nov. 30, 1983), at 5.

binding on all the detainees who might file for asylum on the grounds of membership in a particular social group. Thus, even if these individuals were said to be part of a social group, the representative cases have failed to establish a statutory condition for asylum status, *i.e.*, a well-founded fear of persecution. The stipulation and the record appear to reflect an intent to make the Board's decisions in these cases completely dispositive of the detainees' asylum claim on the basis of social group, in order to avoid burdensome litigation. Unless I misread the record, therefore, there will be no further motions and appeals by those similarly situated.

Even if the parties were not bound by the stipulation discussed above, it would be awkward to insist that the Board articulate a more detailed standard, especially at the behest of the prevailing party, for determining what characteristics transform individuals into particular social groups. The Board felt it unnecessary to decide whether the Marielitos constitute a social group because of its conclusion that the evidence presented that they would be persecuted if they were returned to Cuba was insufficient to justify reopening their exclusion hearings. I am reluctant to substitute my judgment for that of the Board in order to insist that the Board provide an exegesis on the phrase "membership in a particular social group" when the Board did not feel that such was necessary to the cases before it. Under the circumstances, such a discussion would have the earmarks of an advisory opinion on an issue that, while important, did not need to be resolved by the Board in arriving at its conclusion. The Board's decision to limit itself to resolving issues necessary for its conclusion is approved.

IV. *Conclusion*

For the reasons stated above, I hereby approve the Board's action on both issues raised by INS in its referral of these cases. The records in these cases will be returned to the Board.