## MATTER OF BARRERA

### In Exclusion Proceedings

### A–24794021

*Decided by Board January 5, 1989*

(1) The applicant's motion to reopen exclusion proceedings is denied where prima facie eligibility for asylum has not been established, and the claim is virtually the same as that of the aliens in *Matter of Leon-Orosco and Rodriguez-Colas*, 19 I&N Dec. 136 (BIA 1983; A.G. 1984), as it relates to the fate of the Marielitos who were returned from the United States to Cuba.

(2) The situation faced by the Marielitos who attempted to leave Cuba is not materially comparable to that of the Marielitos who left as part of the boatlift; those Marielitos who attempted to leave Cuba were not recipients of the "no reprisal" assurances initially made by the Cuban Government in 1984 and reiterated in 1987.

(3) The Cuban Government's diplomatic assurances of "no reprisals," while not determinative, are meaningful evidence in the evaluation of an applicant's asylum claim.

(4) The Board of Immigration Appeals adopts the official position of the Department of State to the effect that the Cuban Government's actions are consistent with its diplomatic assurances that distinctions in treatment of Marielitos are based on an individual returnee's criminal activities in the United States and not on a returnee's participation in the boatlift or on his exclusion from the United States.

(5) The repatriation agreement entered into between the United States and Cuba has significant evidentiary weight where it represents formal, well-publicized diplomatic assurances by the Government of Cuba; where that government is aware of the impact on international opinion of failure to honor its obligations; and where there is no meaningful evidence of Cuban noncompliance with this agreement first entered into in 1984.

EXCLUDABLE: Act of 1952—Sec. 212(a)(9) [8 U.S.C. § 1182(a)(9)]—Crime involving moral turpitude

Sec. 212(a)(20) [8 U.S.C. § 1182(a)(20)]—No valid immigrant visa

Interim Decision #3093

ON BEHALF OF APPLICANT:
  Deborah S. Ebel, Esquire
  Long, Aldridge & Norman
  Two Concourse Parkway, Suite 750
  Atlanta, Georgia 30328-5347

  Gary Leshaw, Esquire
  Atlanta Legal Aid Society
  340 W. Ponce De Leon Avenue
  Decatur, Georgia 30030

  Myron N. Kramer, Esquire
  Hurt, Richardson, Garner, Todd &
    Cadenhead
  260 Peachtree Street, N.W., 20th Floor
  Atlanta, Georgia 30303

ON BEHALF OF SERVICE:
  Craig O. Raynsford
  Associate General Counsel

BY:  Milhollan, Chairman; Dunne, Vacca, Morris, and Heilman, Board Members

In a decision dated March 17, 1988, an immigration judge denied the applicant's motion to reopen exclusion proceedings for reconsideration of his asylum claim. The applicant has appealed. The appeal will be dismissed. The request for oral argument before the Board is denied.

The applicant is a 31-year-old native and citizen of Cuba. He is a so-called "Marielito," one of those Cubans who was part of the massive exodus from Mariel, Cuba, in the spring of 1980 and was subsequently paroled into the United States. We are satisfied from a review of the record that the applicant was properly placed in exclusion proceedings and that he received a fair hearing. We further find that the immigration judge properly concluded from the applicant's admissions that he was an intending immigrant without the required documents and correctly found him excludable under section 212(a)(20) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(20) (1988). See Matter of Castellon, 17 I&N Dec. 616 (BIA 1981). We are also satisfied that the record establishes the applicant's excludability under section 212(a)(9) of the Act. The record contains a certified copy of a conviction record which reflects that the applicant was convicted in the State of Florida on July 13, 1983, of burglary and theft and sentenced to 2 years' incarceration. The record also indicates that the applicant was arrested in Cuba for stealing and received a 6-month sentence.

Following his conviction in this country, the applicant's immigration parole was revoked and he was placed in exclusion proceedings. At his hearing on May 24, 1985, the applicant was found excludable under sections 212(a)(9) and (20) of the Act and his asylum

838

application was denied. The applicant did not appeal and the decision of the immigration judge became administratively final.

The applicant subsequently filed a motion to reopen which was never adjudicated. On January 25, 1988, the applicant again filed a motion to reopen which is the subject of the present appeal. In support of his motion, the applicant presented new evidence regarding the fate of 201 Marielitos who had been returned to Cuba in 1985. The evidence presented by the applicant consisted of a 1985 and a 1988 declaration of Professor Jorge Dominguez and news articles. The first declaration was made shortly before the 1985 repatriation of Marielitos and was principally based on an analysis of Fidel Castro's December 14, 1984, speech ("Castro speech") concerning the forthcoming repatriation process and on statements of United States State Department officials. The 1988 declaration was based both on Professor Dominguez' prior declaration and other evidence including newspaper article accounts of what happened to the 1985 returnees. The applicant's evidence also included the newspaper articles referred to in the Dominguez declaration as well as other articles about the 1985 returnees. The applicant asserted that this evidence establishes that these Marielitos are being persecuted either as a social group, a group of political dissidents, or as a distinguishable nationality. He contended that, therefore, he has a well-founded fear of persecution in Cuba as a member of this group.

Specifically, the applicant contended that the new evidence establishes persecution on two levels. First, the record reflects that one-third of the 201 returnees were held in Cuban prisons for about 2 and ½ years after their return to Cuba for crimes allegedly committed in the United States, and that as of November 1987 one-fifth of the 201 returnees were still in jail. The applicant noted that United States press reports had indicated that none of the 1985 returnees had time left on their sentences when they were repatriated. Therefore, Professor Dominguez concluded that Mariel Cubans were being "persecuted" because they were serving time in Cuban jails for United States crimes, despite having completed their prison sentences in the United States.

The applicant also contended that his new evidence established that repatriated Marielitos who were not imprisoned were nevertheless subject to a reintegration process that resulted in close monitoring and restricted freedom. To illustrate his contention, the applicant offered the statements of several Marielitos who were interviewed by reporters in the spring of 1986 and more recently in the wake of the Atlanta and Oakdale prison riots in November of 1987. According to those Marielitos who were interviewed, these re-

strictions took the form of close monitoring of the activities of the returnees by the Cuban Committee for Defense of the Revolution. The applicant also based his fear of persecution on political opinion and nationality. The applicant noted that Marielitos continue to be characterized as "anti-social" and this label is viewed as a political fact. With regard to persecution based on nationality, the applicant noted that Cubans who left via Mariel renounced their citizenship and those that have been returned are treated differently than those Cubans who never left.

The Immigration and Naturalization Service objected to the applicant's motion to reopen and asserted that, even assuming that Marielitos are forced to serve the equivalent Cuban sentence for their United States crimes, this does not establish a pattern of group persecution. Rather, according to the Service, such a practice would indicate that Cuban authorities are evaluating the returnees as individuals and determining under Cuban law when these criminals should be released into Cuban society. This is entirely consistent with Castro's December 14, 1984, speech regarding the proposed treatment of repatriated Marielitos. Castro stated:

> Anyone who committed a crime in the United States, any significant crime, and most importantly, anyone who committed a bloody crime, should not remain unpunished. This is basic ethics and security reasons lead us to think that anyone who has committed a crime in the United States . . . should not remain without due punishment. It is unthinkable that we would allow those who have committed bloody crimes to return here and be sent out on the streets. That is unthinkable. Therefore, even though there is no agreement and treaty regarding this, those people will be appropriately punished in our country. If they have committed minor crimes, or crimes that are punishable here, they would have to face the corresponding punishment, the punishment agreed upon or the punishment in keeping with our laws. We will consider the legal aspects that correspond to each case. That is the purpose, if it applies. We have agreements with many countries; if a crime is committed abroad, it may be tried here. We do not have this commitment. This is an ethical matter. This will be the policy to follow in these cases. No crime will go unpunished . . . . These persons will be treated most humanely here and in accordance with the principles of the revolution in line with the policy we have outlined.

Castro speech, *supra*, at 12–13.

In an official statement published in Cuba's daily newspaper, *Granma*, on November 25, 1987, Cuban Vice Minister of Foreign Relations Ricardo Alarcon de Quesada reiterated that his government's position with regard to the returnees has been consistent since 1984 ("Alarcon statement"). He stated that the policy of "no reprisals" continues to encompass the assurance first made in 1984 not to punish or discriminate against returnees based on their departure from Cuba or their exclusion from the United States. Vice Minister Alarcon also stated that the Cuban Government had

made every attempt to remove any stigma that may have been associated with the boatlift participants when they left Cuba in 1980. He noted that Cuba had been reviewing the criminal records of the returnees and making individualized determinations under its laws and policies as to who should be released into Cuban society and the timing of their release.

The Service also analogized the restrictions placed on the repatriated Marielitos to those often imposed by our criminal parole process to monitor the behavior of convicts who obtain early release from their sentences. The record contains a declaration executed on March 4, 1988, by Michael G. Kozak, Principal Deputy Legal Advisor of the State Department ("Kozak declaration"). Mr. Kozak stated:

Cuban representatives in both public and private statements clearly have eschewed ill-treatment of returnees based on their departure from Cuba in 1980 or the mere fact that they are excludable for substantive reasons from the United States. The Cuban Government's actions, as reported by their representatives and by Applicants, would appear consistent with Cuban Government statements that distinctions in treatment are based of [sic] the individual returnee's criminal behavior in the United States and not on the person's mere participation in the Mariel boatlift or exclusion from the United States.

Kozak declaration at 15.

In a decision dated March 17, 1988, the immigration judge found that the applicant does not come within the definition of refugee on the basis of his fear of returning to Cuba because he will be jailed to complete his sentence for stealing. The immigration judge also found that the averments made by the applicant in his motion to reopen did not establish that prior returnees suffered persecution upon their return to Cuba. The immigration judge noted that the applicant may have to undergo close screening to determine whether or not he poses a danger to Cuban society. He also noted that this process may be foreign to American legal concepts, but it appears to be used to protect law-abiding members of Cuban society from danger and not to punish those returning for beliefs or lawful characteristics they possess.

The immigration judge considered the applicant's request that the denial of his asylum application be reconsidered in light of *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987). In addition, the immigration judge considered the applicant's request for reopening of his own case as well as reopening of the Board's decision in *Matter of Leon-Orosco and Rodriguez-Colas*, 19 I&N Dec. 136 (BIA 1983; A.G. 1984), *rev'd sub nom. Fernandez-Roque v. Smith*, 599 F. Supp. 1103 (N.D. Ga. 1984), *aff'd sub nom. Garcia-Mir v. Smith*, 766 F.2d 1478 (11th Cir. 1985), *cert. denied sub nom. Marquez-Medina v. Meese*, 475 U.S. 1022 (1986). The immigration judge stated that he was re-

viewing the evidence under the standard set out in *Cardoza-Fonseca* and *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). He stated that he considered both the evidence presented in *Leon-Orosco* as well as the new evidence submitted but concluded that under the test set forth in *Matter of Mogharrabi, supra*, it did not establish prima facie eligibility for asylum. The immigration judge further concluded that class treatment of motions to reopen was inappropriate and accordingly denied the applicant's request that the *Leon-Orosco* case be reopened or reconsidered. Finally, the judge also denied the motion to reopen as a matter of discretion on the grounds that the applicant had not satisfied the threshold burden for reopening and that, in any case, it was unlikely that he would succeed in his asylum application if the motion were granted. *See INS v. Abudu*, 485 U.S. 94 (1988).

On appeal, the applicant contends that the immigration judge failed to correctly apply recent case law and to properly consider newly obtained evidence with respect to the applicant's fear of persecution should he be returned to Cuba. The applicant argues that he has met his burden of showing a well-founded fear of persecution in Cuba due to his status as a Marielito. He further contends that the evidence clearly shows that a reasonable man in his position has a sufficient cause to fear repatriation to Cuba. He claims persecution based on political opinion, nationality, and on membership in a particular social group, *i.e.*, the Marielitos. The applicant has also submitted additional evidence in the form of a statement to the United Nations Commission on Human Rights presented by Ambassador Vernon Walters, the United States' representative, and an excerpt from the Department of State Country Reports on Human Rights Practices for 1987 pertaining to Cuba. 1987 Country Reports on Human Rights Practices, Joint Committee of the Senate and House of Representatives, 100th Congress, 2d Session (1987) ("Country Reports"). These documents strongly criticize Cuba's human rights record under Castro. As the applicant points out, the Country Reports state that former political prisoners are subject to constant surveillance and harassment. *Id.* at 448. Moreover, daily life is closely monitored by the Committees for the Defense of the Revolution. *Id.* at 448. The applicant also notes that those Cubans who had taken refuge in the Peruvian Embassy, but who did not leave Cuba as part of the boatlift, are not allowed to leave Cuba and some are still serving prison terms stemming from their actions. *Id.* at 445-46.

In opposition to the applicant's appeal from the denial of the motion to reopen, the Service continues to maintain that the new evidence offered by the applicant fails to establish that the 1985 re-

turnees were treated alike or that their treatment amounted to persecution. Moreover, the Service contends that it fails to show that the Marielitos constitute a social group or nationality for asylum purposes or that they share a common political opinion that is opposed to the Cuban regime. According to the Service, what the evidence does show is that, consistent with Castro's statements, each returnee has been treated differently, ranging from those who were released promptly to those who are still detained. The applicant's own evidence, the Service argues, indicates that the Cuban Government has released and is reintegrating into its society the large majority of the returnees. With regard to those still detained and monitored, the Service asserts that the evidence submitted by this applicant shows that the Cuban Government appears to be drawing its own distinctions among the returnees on the basis of their criminal backgrounds. Indeed, the Service alleges, the evidence indicates that Cuba has treated returnees largely in keeping with the statements made by Castro in his 1984 speech.

The Service also asserts that the additional evidence provided by the applicant with the appeal does not support reopening. It is noted that the statement by Ambassador Vernon Walters and the excerpt from the Country Reports strongly criticize Cuba's human rights record under Castro. However, according to the Service, these documents do not support the conclusion that a person in the applicant's position would have a reasonable fear of persecution based on political opinion, designation as a distinct nationality, or membership in a particular social group. Neither the Country Reports nor the Ambassador's statement are said to cite mistreatment of Marielitos as a social group at any point. Nor does either chronicle any specific case of a Marielito who has been imprisoned or persecuted for a political opinion attributed to the individual because he left Cuba during the Mariel boatlift. Moreover, the Service notes that even though daily life of some returnees may be closely monitored, these conditions apply to the Cuban population as a whole. Accordingly, the Service concludes that the statement by Ambassador Walters and the Country Reports which the applicant submitted with this appeal provide no additional basis for concluding that reopening is warranted.

A motion to reopen will not be granted unless it states new and material facts and is supported by evidentiary material. 8 C.F.R. §§ 3.2 and 3.8 (1988); *INS* v. *Wang*, 450 U.S. 139 (1981). The regulations also provide that reopening will not be permitted to afford an applicant an opportunity to apply for asylum or withholding of deportation if he knew about such relief when he was in exclusion proceedings and had an opportunity to apply for it at that time,

unless the motion is based upon new circumstances. 8 C.F.R. § 242.22 (1988). A prima facie case of eligibility for the relief sought must be established before a motion to reopen will be granted. *INS v. Wang, supra; Matter of Martinez-Romero*, 18 I&N Dec. 75 (BIA 1981), *aff'd, Martinez-Romero v. INS*, 692 F.2d 595 (9th Cir. 1982); *Matter of Lam*, 14 I&N Dec. 98 (BIA 1972); *see also Matter of Garcia*, 16 I&N Dec. 653 (BIA 1978); *Matter of Sipus*, 14 I&N Dec. 229 (BIA 1972). The United States Supreme Court has recently held that an alien who has already been ordered deported has a much heavier burden when he advances his request for asylum in a motion to reopen. *INS v. Abudu, supra.* An application to reopen is addressed to the sound discretion of the Attorney General. *Balani v. INS*, 669 F.2d 1157 (6th Cir. 1982); *accord Israel v. INS*, 710 F.2d 601 (9th Cir. 1983), *cert. denied*, 465 U.S. 1068 (1984). Such a motion can be denied on discretionary grounds alone where there are significant reasons for denying reopening. *INS v. Rios-Pineda*, 471 U.S. 444 (1985); *INS v. Phinpathya*, 464 U.S. 183 (1984); *INS v. Wang, supra; INS v. Bagamasbad*, 429 U.S. 24 (1976); *Matter of Barocio*, 19 I&N Dec. 255 (BIA 1985); *Matter of Reyes*, 18 I&N Dec. 249 (BIA 1982); *Matter of Rodriguez-Vera*, 17 I&N Dec. 105 (BIA 1979).

We are satisfied from a review of the record that the motion to reopen and reconsider does not meet the requirements set forth in 8 C.F.R. §§ 3.2 and 3.8 (1988) as developed in the above-cited cases. The applicant has submitted no legal arguments or precedents in support of his motion which demonstrate that the immigration judge's findings and conclusions with regard to his persecution claim were inappropriate or that we should now reconsider those issues. Nor does it establish prima facie eligibility for the requested relief necessary to warrant reopening of these proceedings. We note that an alien who is seeking withholding of deportation from any country must show that his "life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." Section 243(h)(1) of the Act, 8 U.S.C. § 1253(h)(1) (1988). In order to make this showing, the alien must establish a "clear probability" of persecution on account of one of the enumerated grounds. *INS v. Stevic*, 467 U.S. 407, 413 (1984). This clear-probability standard requires a showing that it is more likely than not that an alien would be subject to persecution. *Id.* at 429-30.

In order to establish eligibility for a grant of asylum, an alien must demonstrate that he is a "refugee" within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1988). *See* section 208 of the Act, 8 U.S.C. § 1158 (1988). That definition includes the requirement that an alien demonstrate that he is unwilling or

unable to return to his country because of persecution or a "well-founded fear" of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The meaning of the term "well-founded fear" has been the subject of considerable controversy and litigation. In *INS* v. *Cardoza-Fonseca*, *supra*, the Court held that the clear probability and well-founded fear standards do in fact differ. The Court found that a probable showing of persecution need not be made in order to establish a well-founded fear of persecution under section 208 of the Act. It specifically declined to attempt a detailed definition of "well-founded fear" or an explanation as to how that term should be applied. Noting that there is "obviously some ambiguity" in the term, the Court left a more concrete definition to the process of case-by-case adjudication. *Id.* at 448. It is clear that to a large degree the meaning of "well-founded fear" can in fact only be determined in the contexts of individual cases.

Although, as noted above, the Supreme Court did not attempt to define "well-founded fear" in *INS* v. *Cardoza-Fonseca*, *supra*, it offered this guide in dictum in *INS* v. *Stevic*, *supra*, for the meaning of well-founded fear: "[S]o long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a *reasonable possibility*." *Id.* at 424–25 (emphasis added). In *Cardoza-Fonseca*, *supra*, the Court noted the "obvious focus on the individual's subjective beliefs" in assessing whether a fear is well founded. *Id.* at 431.

We agree with and adopt the general approach set forth by the United States Court of Appeals for the Fifth Circuit; that is, that an applicant for asylum has established a well-founded fear if he shows that a reasonable person in his circumstances would fear persecution. *Guevara-Flores* v. *INS*, 786 F.2d 1242 (5th Cir. 1986). As noted by the Second Circuit, this "reasonable person standard appropriately captures the various formulations that have been advanced to explain the well-founded fear test." *Carcamo-Flores* v. *INS*, 805 F.2d 60, 68 (2d Cir. 1986). It is a standard that provides a "common sense" framework for analyzing whether claims of persecution are well founded. Moreover, a reasonable person may well fear persecution even where its likelihood is significantly less than clearly probable. The alien's own testimony may in some cases be the only evidence available, and it can suffice where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for his fear. *Matter of Mogharrabi*, *supra*.

In this case we note that in *Matter of Leon-Orosco and Rodriguez-Colas, supra,* we held, and the Attorney General affirmed, that even assuming the Marielitos constituted a particular social group within the meaning of the statute, a prima facie showing had not been made that members of that group had well-founded fears of persecution if returned to Cuba. The claim of the applicant in this case is virtually the same as that of the aliens in the published decision, except that we now have information concerning the fate of the 201 Marielitos who were returned from the United States to Cuba in 1985. As indicated above, the applicant argues that this evidence proves that returning Marielitos face persecution upon arrival back in Cuba. The applicant also argues for reopening and reconsideration in light of the Supreme Court's decision in *INS* v. *Cardoza-Fonseca, supra,* and for a reconsideration of *Leon-Orosco and Rodriguez-Colas* in light of *Cardoza-Fonseca.*

For a better understanding and evaluation of the general treatment of the initial group of 201 Cuban returnees both in the United States prior to their departure and in Cuba after their repatriation, it is useful to have an overview of the nature of some of their conviction records in the United States and Cuba. This information, provided in table form by John Simon, Deputy Assistant Commissioner for Detention and Deportation for the Service, also refers to the unfinished prison sentences facing most of the returnees in the United States. In a speech dated December 14, 1984, Castro referred to this information when he stated that "U.S. authorities have committed themselves to sending all documents, all details, and all evidence concerning these people." Castro speech, *supra,* at 12. According to the table of those returned to Cuba in 1985, their convictions within the United States included: 11 convictions for murder, attempted murder, or manslaughter with sentences of up to 7 years' imprisonment; 40 convictions for robbery offenses with sentences of up to 99 years' imprisonment; 38 convictions for aggravated assaults or batteries (20 of which involved the use of deadly weapons) with sentences of up to 10 years' imprisonment; 18 convictions for serious sexual offenses, including rape, with sentences of up to 10 years' imprisonment; 17 convictions relating to drug trafficking with sentences of up to 5 years' imprisonment; 11 burglary convictions with sentences ranging up to 99 years' imprisonment; 2 kidnapping convictions; 2 arson convictions; 1 terrorist threat conviction resulting in a sentence to 5 years' imprisonment; and 1 felony grand theft conviction resulting in a sentence to 8 years' imprisonment. In addition, more than 10 of those returned had admitted to convictions of serious crimes in Cuba, 5 of which were murder convictions. By any standards, it is under-

846

standable that a government could have concerns over the threat to the public safety that some or all of these individuals could pose.

We conclude, as did the immigration judge, that the record as a whole does not establish prima facie eligibility for asylum. We agree with the Service that the statement of Ambassador Walters and the excerpt from the Country Reports do not support reopening. The documents do not support the conclusion that a person in the applicant's position would have a reasonable fear of persecution based on membership in a particular social group. Neither the Country Reports nor the Ambassador's statement cite mistreatment of Marielitos as a social group at any point. With regard to the Country Reports which indicate that some Cubans are still imprisoned in Cuba for having taken refuge in the Peruvian Embassy, we note that there is a distinction between "attempted Marielitos" and the Marielitos. We have reviewed asylum appeals from attempted Marielitos who were able to subsequently leave Cuba and some have been granted. Here, we are not dealing with attempted Marielitos who tried but could not leave Cuba. Instead, we are dealing with those who left as part of the boatlift, and we are reviewing present facts—particularly the treatment of those similarly situated who were returned. Specifically, the applicant has not shown that the situation faced by the attempted Marielitos is materially comparable to his own. Moreover, those attempted Marielitos were not recipients of the assurances initially made by the Cuban Government in 1984 and reiterated in 1987 of "no reprisals" against the Marielitos. Alarcon statement, *supra*. These assurances, alone, put the Marielitos in a different situation than the attempted Marielitos. There are no allegations that the returned Marielitos who are not considered a threat to Cuban society have been denied employment, education, housing, permission to travel, or other benefits of this sort. See *Kovac* v. *INS*, 407 F.2d 102 (9th Cir. 1969).

The record reflects that after their repatriation, these 201 Cuban returnees were detained and interviewed, and their records reviewed, before it was decided who would be released and who would be sent to prison. Castro had announced that anyone who had committed a "bloody crime" in the United States should not go unpunished upon return to Cuba. Castro speech, *supra*, at 12–13. Cuban officials said that the Marielitos would be released unless they had been convicted in the United States of a violent crime or a sexual offense. The United States received diplomatic assurances that the Marielitos would not be penalized for having left Cuba or for having participated in the boatlift. Kozak declaration, *supra*, at 5. Cuban Vice Minister of Foreign Relations Alarcon, head of the

Interim Decision #3093

Cuban delegation involved in negotiations with the United States concerning the repatriation of the Marielitos, announced that the policy of "no reprisals" continues to encompass the assurance first made in 1984 not to punish or discriminate against the Marielitos based on their departure from Cuba or their exclusion from the United States. Alarcon statement, *supra*. He stated that Cuba had been reviewing the criminal records of the Marielitos and making individual determinations under its laws and policies as to who should be released into Cuban society and the timing of their release. The Vice Minister stated that the Cuban Government has always considered the immigration agreement, entered into with the United States in December of 1984 to normalize immigration procedures, as something "positive and beneficial for both sides." As for the Cuban Government's diplomatic assurances, reliance on which in part formed the basis for the decision to renew the repatriation program, such assurances, while not determinative, are meaningful evidence in the evaluation of the applicant's allegations and claims.

In early 1988, Michael Kozak, the Principal Deputy Legal Advisor of the Department of State and head of the United States delegation involved in negotiations with Cuba, stated that Cuban representatives have clearly eschewed ill-treatment of the Marielitos because of their departure from Cuba in 1980 or because they are excludable for substantive reasons from the United States. Kozak declaration, *supra*. We consider Mr. Kozak's statement to constitute the official view of the Department of State on conditions facing the Marielitos. After extensive negotiations with the Cuban delegation, Mr. Kozak came to the conclusion that the Marielitos will not be persecuted upon return to Cuba. This conclusion was buttressed by statements from the Cuban delegation that it was aware of the likely impact on United States and international opinion of failure to treat the Marielitos in the manner described. Mr. Kozak also stated that the Cuban Government's actions, as reported by their representatives and by the applicant, would appear consistent with that government's diplomatic assurances that distinctions in treatment are based on an individual returnee's criminal activity in the United States and not on the returnee's mere participation in the boatlift or on his exclusion from the United States. Kozak declaration, *supra*, at 15. Thus, even if we were to treat Mr. Kozak's statement as expert opinion only, we would find it to be entitled to very great weight, and to be evidence which refutes that offered by the applicant.

Moreover, the statement of Mr. Kozak may be considered by the Board to constitute the official position of the Department of State

848

that the diplomatic assurances of the Government of Cuba are in the nature of a bilateral agreement, which involves international obligations that have been recognized by the Government of Cuba. More than a mere conclusory advisory opinion, the fact of the agreement in itself has significant evidentiary weight where it represents formal, well-publicized diplomatic assurances by the Government of Cuba; where that government is aware of the impact on international opinion of failure to honor its obligations; and where there is no meaningful evidence of Cuban noncompliance with this agreement first entered into in 1984.

We note that Castro stated that the Marielitos will be treated "in accordance with the principles of the revolution in line with the policy we have outlined." Castro speech, *supra*, at 12–13. The detention and screening process applied by the Cuban Government seeks to identify those Marielitos who, based on their criminal behavior in the United States, constitute a danger to the public safety. These concerns for public safety dictate who should be released into Cuban society and the timing of their release. This reintegration process that the applicant may have to undergo upon return to Cuba is not employed to punish those returning on account of race, religion, nationality, membership in a particular social group, or political opinion but is motivated by a desire to protect law-abiding members of Cuban society. We agree with the immigration judge that the evidence the applicant has submitted in support of his motion to reopen and reconsider does not establish prima facie eligibility for the requested relief.

As stated above, given the nature of the crimes committed by many of the 1985 returnees, we are not persuaded that their detention upon return to Cuba sufficiently establishes that they were persecuted. Similarly, we are not satisfied that the treatment the applicant may encounter upon return to Cuba will constitute persecution rather than an attempt by the Cuban Government to protect its society from known criminals.

Further, we do not find that the evidence the applicant has submitted in support of his motion to reopen establishes prima facie eligibility for asylum on the basis of the applicant's political opinion. The applicant has failed to establish that Marielitos share a common political opinion that is opposed to the Cuban Government. The applicant relies solely on the Atlanta and Oakdale riots to conclude that Marielitos as a group oppose the Castro regime. However, not all of the Marielitos participated in the riots. Moreover, since many aliens wish to reside in the United States for many reasons other than political opposition to their government,

the prison uprisings do not establish that even the Marielitos who rioted are opposed to the Cuban Government.

We also do not find that the evidence submitted in support of the motion establishes prima facie eligibility for asylum on account of the applicant's nationality. The applicant appears to be asserting that the returnees are treated as foreign nationals or stateless persons rather than Cuban citizens by the Cuban Government. There is no indication that any such renunciation of citizenship by the Marielitos has been given any effect by the Government. Moreover, there is no indication that the returnees are considered stateless. Even if the record were to show that the returnees are treated as stateless persons, we note that there is no evidence that Cuba persecutes those who are not citizens of Cuba. The record would indicate that the returnees are viewed as Cubans by the Cuban Government. Vice Minister Alarcon expressly assured the United States delegation that the treatment afforded the returnees will be the same as that of any other Cuban citizen.

We emphasize that although the immigration judge made his decision in this case prior to the Supreme Court's decision in *INS* v. *Cardoza-Fonseca, supra,* and our decision in *Matter of Mogharrabi, supra,* we have considered the case under the view of the law set forth in *Cardoza-Fonseca* and *Mogharrabi.* From our careful review of the entire record we have concluded that a reasonable person in the applicant's position would not fear persecution upon return to Cuba. The averments made by the applicant in his motion do not establish prima facie eligibility for either asylum or withholding of deportation to warrant reopening of these proceedings. The denial of the applicant's motion will accordingly be upheld.

Based on the above discussion, we find that the applicant has failed to establish sufficient cause to warrant reopening of his exclusion proceedings.

The applicant's appeal will be dismissed.

**ORDER:** The appeal is dismissed.