# In re L-O-G-, Respondent

File A28 862 064 et al.- Miami

*Decided June 14, 1996*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Reopening may be had where the new facts alleged, together with the facts already of record, indicate a reasonable likelihood of success on the merits, so as to make it worthwhile to develop the issues at a hearing. Where ruling on a motion requires the exercise of judgment regarding eligibility for the relief sought, the Board does not require a conclusive showing that, assuming the facts alleged to be true, eligibility for relief has been established. By granting reopening the Board does not rule on the ultimate merits of the application for relief. *Matter of Sipus*, 14 I&N Dec. 229 (BIA 1972), reaffirmed.

(2) Reopening to apply for suspension of deportation is granted where 1) the 15-year-old respondent has lived in the United States since the age of 6; 2) the adult respondent, her mother, also has a 6-year-old United States citizen child; 3) the respondents are from a country where economic and political conditions are poor; and 4) the respondents have been covered by the Nicaraguan Review Program since 1987.

FOR RESPONDENT: Ernesto Varas, Esquire, Miami, Florida

FOR IMMIGRATION AND NATURALIZATION SERVICE: Mark N. Glickman, General Attorney

BEFORE: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; HOLMES, HURWITZ, VILLAGELIU, COLE, ROSENBERG, MATHON, and GUENDELSBERGER, Board Members. Dissenting Opinion: FILPPU, Board Member, joined by VACCA and HEILMAN, Board MEMBERS

SCHMIDT, Chairman:

This case was last before us on May 10, 1995, when we dismissed an appeal from an Immigration Judge's denial of the respondents' applications for asylum and withholding of deportation. The respondents, a mother and her 15-year-old daughter, have now filed a motion to reopen their deportation proceedings to apply for suspension of deportation. The respondents claim extreme hardship to themselves. The adult respondent also claims extreme hardship to her 6-year-old United States citizen child.

The Immigration and Naturalization Service opposes the motion to reopen for two reasons. First, the Service asserts that the respondents do not merit suspension of deportation, or reopening, as a matter of discretion because of their "obvious disregard for the immigration laws of the United States." Second, the Service argues that the respondents "have not shown that they or their United States citizen child/brother would suffer extreme hardship if returned to Nicaragua," because they have not shown "unique and extenuating circumstances."

The motion to reopen will be granted.

## I. REQUIREMENTS FOR REOPENING

An alien may file a motion to reopen to this Board in order to apply for discretionary relief from deportation. 8 C.F.R. § 3.2 (1995). The Board has "broad discretion to grant or deny such motions." *INS v. Doherty*, 502 U.S. 314 (1992); *INS v. Rios-Pineda*, 471 U.S. 444 (1985); *INS v. Jong Ha Wang,* 450 U.S. 139 (1981); *Matter of Coelho*, 20 I&N Dec. 464 (BIA 1992).

There are at least three grounds on which the Board may deny motions to reopen. Failure to comply with the regulatory requirements which govern such motions can result in denial of the motion. In addition, a motion to reopen may be denied because the applicant has not established prima facie eligibility for the underlying relief being sought. *INS v. Abudu,* 485 U.S. 94 (1988). Finally, where the relief being sought is discretionary, the Board may deny reopening on discretionary grounds alone. *INS v. Doherty, supra; INS v. Abudu, supra; INS v. Rios-Pineda, supra; Matter of Barrera,* 19 I&N Dec. 837 (BIA 1989).

The Service does not argue, and we do not find, that the respondents have failed to satisfy the regulatory requirements for reopening. *See* 8 C.F.R. §§ 3.2, 3.8 (1995). The questions raised by the Service, which we must address, are (1) whether the respondents have made a prima facie showing of eligibility for suspension of deportation, and (2) whether their motion should be denied on discretionary grounds.

We find no basis for denying the respondents' motion to reopen in the exercise of discretion. The Service argues that the motion should be so denied because the respondents filed a "frivolous" appeal and failed to depart voluntarily when required to do so. We do not agree that the respondents' appeal was frivolous. The Immigration Judge issued a 9-page decision denying the respondents' applications for asylum and withholding of deportation. The respondents filed a thoughtful brief in support of their appeal from that decision. We affirmed the Immigration Judge's decision in a brief order that did not indicate that the respondents' appeal was frivolous or otherwise wholly lacking in merit.

The respondents technically should have departed from the United States voluntarily within 30 days of our May 10, 1995, decision in this case.

However, we note that the respondents, as Nicaraguan nationals, were eligible to apply for work authorization even after our decision in their case was rendered, pursuant to the Nicaraguan Review Program. While that program terminated on June 13, 1995, those covered by the program were authorized to request permission to work pending resolution of their applications for suspension of deportation. Given the fact that the Service has taken no action to deport these respondents and, indeed, indicated its acquiescence in the filing of suspension applications by similarly situated individuals, we find no reason to deny reopening as a matter of discretion. *See* discussion *infra* part III. *See generally Matter of Pena-Diaz*, 20 I&N Dec. 841 (BIA 1994).

The determinative issue in this case, then, is whether the respondents have established prima facie eligibility for suspension of deportation.

To establish eligibility for suspension of deportation, an alien must show that (1) she has been physically present in the United States for the 7 years immediately preceding the filing of the suspension application; (2) she has been a person of good moral character for the same period of time; and (3) her deportation would result in extreme hardship to herself or to her United States citizen or lawful permanent resident spouse, child, or parent. Section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1) (1994). The older respondent in this case, now 38 years of age, entered the United States in April of 1988. Her daughter, now 15, entered in 1986. Neither has left the country since their respective arrivals. The continuous physical presence requirements have been met. The record does not indicate that these respondents lack good moral character.

The remaining and critical issue is whether the respondents have made a prima facie showing of extreme hardship so as to warrant reopening of their deportation proceedings.

## II. MEANING OF THE TERM "EXTREME HARDSHIP"

### A. The Legislative History

In assessing the meaning of the term "extreme hardship," it is important to recall that section 244(a)(1) of the Act previously included the requirement of "exceptional and extremely unusual hardship." In 1962, Congress amended the suspension statute to require only "extreme" hardship, and left the "exceptional and extremely unusual hardship" language intact solely for those aliens who were convicted of crimes, or who were otherwise deportable on other specified grounds. *See* Act of October 24, 1962, Pub. L. No. 87-885, § 4, 76 Stat. 1247. We have previously acknowledged that in amending section 244(a)(1) in this manner, Congress intended to lessen the degree of hardship required to qualify for suspension of deportation. *See Matter of Hwang,* 10 I&N Dec. 448 (BIA 1964).

The legislative history is silent regarding the reasons for the 1962 change in the suspension of deportation statute. We do not suggest that the change

reflects a congressional desire to return to the pre-1952 pattern of allowing aliens to remain in this country simply because they had been here for a time, or had acquired United States citizen relatives. However, it is clear that Congress found the "exceptional and extremely unusual" language inappropriate, and that it intended to make the suspension remedy more widely available by amending the statute in 1962. That clearly was a remedial intent.

Moreover, section 244(a)(2) of the Act, which provides for suspension of deportation for certain criminal or otherwise deportable aliens, still requires a showing of "exceptional and extremely unusual hardship" for eligibility for this relief. The term "extreme hardship" in section 244(a)(1) should not be defined or applied so restrictively that it effectively subsumes this heightened standard under section 244(a)(2).

## B. The Case Law

"Hardship" is itself a difficult term to define or quantify, and the case law on this subject has reflected this difficulty. As this Board recognized over 30 years ago, the term "extreme hardship" under our immigration laws "is not a definable term of fixed and inflexible content or meaning. It necessarily depends upon the facts and circumstances peculiar to each case." *Matter of Hwang, supra,* at 451. In assessing hardship, and perhaps especially in considering a possible prima facie showing of such hardship, we must keep in mind the subjective nature of the term. Moreover, in analyzing any case involving suspension of deportation, we should also be mindful of the remedial nature of the suspension statute. *See generally Wadman v. INS*, 329 F.2d 812 (9th Cir. 1964).

A comprehensive discussion of the concepts underlying the meaning of extreme hardship was most recently set forth by the Board in *Matter of Ige,* 20 I&N Dec. 880 (BIA 1994). In that case we first referred to the general factors often cited as relevant to the issue of extreme hardship, including the alien's age; the length of her residence in the United States; her family ties in the United States and abroad; her health; the economic and political conditions in the country to which she may be returned; her financial status, business, or occupation; the possibility of other means of adjustment of status, her immigration history; and her position in the community. This summary of factors, initially noted by the Board in *Matter of Anderson*, 16 I&N Dec. 596 (BIA 1978), was derived from a discussion in a committee report in the 94th Congress on § 4 of H.R. 8713, a bill which provided for discretionary adjustment of status for certain aliens whose deportation would result in unusual hardship. *Id.* at 597.

Our decision in *Matter of Ige, supra*, which cited to a variety of Board and court precedents which we shall not repeat here, also summarized certain principles or maxims that have evolved over the years when evaluating the question of extreme hardship. For example, the birth of a United States

citizen child does not in itself establish extreme hardship. Further, a showing of a significant reduction in one's standard of living does not alone compel a finding of extreme hardship, but the political and economic conditions in one's homeland are relevant. A showing of some degree of financial hardship is not in itself sufficient to demonstrate extreme hardship. A claim that an adult or child will have difficulty in readjusting to life in one's native country is also not sufficient without more. The fact that economic, educational, and medical facilities and opportunities may be better in the United States does not in itself establish extreme hardship. Also, the possibility of other means to adjust one's status weighs against a finding of extreme hardship.

Other general maxims, not referenced in *Matter of Ige, supra*, may be gleaned from a review of the case law. The most obvious of these is perhaps the long-recognized rule that a mere showing of 7 years' presence in the United States does not constitute extreme hardship. *Matter of Sipus*, 14 I&N Dec. 229 (BIA 1972). Also, while conditions in the alien's native country may be considered in evaluating an allegation of extreme hardship, a claim of persecution may not generally be presented as a means of demonstrating extreme hardship for purposes of suspension of deportation. *See Gebremichael v. INS,* 10 F.3d 28 (1st Cir. 1993); *Farzad v. INS*, 802 F.2d 123 (5th Cir. 1986); *Kashefi-Zihagh v. INS*, 791 F.2d 708 (9th Cir. 1986); *Sanchez v. INS,* 707 F.2d 1523 (D.C. Cir. 1983); *Hee Yung Ahn v. INS*, 651 F.2d 1285 (9th Cir. 1981); *Matter of Kojoory*, 12 I&N Dec. 215 (BIA 1967); *Matter of Liao*, 11 I&N Dec. 113 (BIA 1965). *But see Blanco v. INS,* 68 F.3d 642 (2d Cir. 1995). Further, equities which are acquired after a final order of deportation has been entered are generally entitled to less weight than those acquired before entry of such an order. *Matter of Correa*, 19 I&N Dec. 130 (BIA 1984).

General rules also revealed by study of the case law are that, with all else being equal, the younger the children, or the wealthier, better-educated, or more employable the alien, the less likely a finding of extreme hardship. *See, e.g., Matter of Kim,* 15 I&N Dec. 88 (BIA 1974). *See generally INS v. Jong Ha Wang, supra.* Additionally, applicants returning to a developed country are less likely to be able to demonstrate extreme hardship than those returning to a less developed or particularly impoverished country. *See Banks v. INS,* 594 F.2d 760 (9th Cir. 1979).

This litany of factors which do not, by themselves, generally constitute extreme hardship, must be considered in proper context. Each case must be carefully evaluated, and all possible hardship factors must be weighed together. *See, e.g., Turri v. INS*, 997 F.2d 1306 (10th Cir. 1993); *Hernandez-Cordero v. INS*, 819 F.2d 558, 563 (5th Cir. 1987); *Prapavat v. INS*, 662 F.2d 561 (9th Cir. 1981). A factor which may not in itself be determinative should be considered, and may become a significant or even critical factor when weighed with all the other circumstances presented. In all cases, the particular degree of personal hardship resulting from each of the factors must be taken into account.

The Supreme Court has held that the Attorney General and her delegates "have the authority to construe 'extreme hardship' narrowly should they deem it wise to do so," and has stated that a narrow interpretation of the term is consistent with the exceptional nature of the suspension remedy. *INS v. Jong Ha Wang, supra,* at 145. The Court used the "narrowly construe" language in ratifying this Board's authority to interpret "extreme hardship" in the particular case before it. *Wang* involved affluent, educated respondents. We do not suggest that the denial of reopening in *Wang* was incorrect. A "narrow" interpretation that denies reopening to aliens such as the Wangs need not be as restrictive as the Service argues.

*Wang* does not require that extreme hardship be construed in the narrowest sense. We have never in our published precedents interpreted the term so narrowly that it is reserved only for those cases involving the most compelling or manifestly unique hardships. Indeed, we do not accept the Service contention in this case that the motion should fail because no "unique or extenuating circumstances" have been shown. The word "extreme" should not be equated with "unique," and hardship for suspension purposes need not be unique to be extreme.

A restrictive view of extreme hardship is not mandated either by the Supreme Court or by our published case law. Our granting of this motion is fully consonant with our seminal decision in *Matter of Anderson, supra.* Moreover, a flexible approach to extreme hardship harmonizes Board law with prevailing case law from the judicial circuits. *See, e.g., Salameda v. INS*, 70 F.3d 447 (7th Cir. 1995); *Blanco v. INS, supra; Tukhowinich v. INS*, 64 F.3d 460 (9th Cir. 1995); *Watkins v. INS*, 63 F.3d 844 (9th Cir. 1995); *Turri v. INS, supra; Babai v. INS,* 985 F.2d 252 (6th Cir. 1993).

## III. PRIMA FACIE SHOWING OF EXTREME HARDSHIP

Bearing in mind all these considerations regarding the meaning of extreme hardship, we turn now to the question of what constitutes a prima facie case of extreme hardship. Just as there are no bright line tests for determining what constitutes extreme hardship and what does not, so there are no easy rules for deciding what makes a prima facie case of such hardship and what does not.

Certain clear requirements must be met, of course, to make such a showing. It is not enough, for example, simply to allege extreme hardship for reasons that will be explained at the reopened hearing. *See Matter of Sipus, supra; see also INS v. Jong Ha Wang, supra.* In addition, the allegations of hardship that are made in a motion to reopen should be specific, not conclusory, and should be supported by evidence in the form of affidavits or other documentation.

However, where, as in suspension cases, ruling on a motion to reopen requires the exercise of judgment regarding eligibility for the relief sought, the Board historically has not required a conclusive showing that, assuming

the facts alleged to be true, eligibility for relief has been established. Rather, we have been willing to reopen "where the new facts alleged, when coupled with the facts already of record, satisfy us that it would be worthwhile to develop the issues further at a plenary hearing on reopening." *Matter of Sipus, supra,* at 231. As the Supreme Court stated in *INS v. Jong Ha Wang, supra*, reopening for a hearing on suspension of deportation is appropriate where the Board is presented with a motion "reliably indicating the specific recent events that would render deportation a matter of extreme hardship." *Id.* at 143.

In considering a motion to reopen, the Board should not prejudge the merits of a case before the alien has had an opportunity to prove the case. *See generally Motamedi v. INS,* 713 F.2d 575 (10th Cir. 1983). By finding that an alien has made out a prima facie case of extreme hardship, we are not deciding that the respondents should be granted suspension of deportation as a matter of law or discretion if the facts alleged are shown to be true. We are deciding only that there is a reasonable likelihood that the statutory requirements for the relief sought have been satisfied, and that there is a reasonable likelihood that relief will be granted in the exercise of discretion. *See M.A. v. United States INS,* 899 F.2d 304 (4th Cir. 1990); *Marcello v. INS*, 694 F.2d 1033 (5th Cir.), *cert. denied*, 462 U.S. 1132 (1983).

The ultimate determination on a suspension application rests with the Immigration Judge after the respondents have had an opportunity to present all the evidence and arguments in their favor at the hearing. *See Matter of Pena-Diaz, supra.* Given the subjective nature of the extreme hardship requirement, it is appropriate for the Immigration Judge to hear in person the evidence in support of the claim. We note that the testimony of suspension applicants, and sometimes of their family members, can often be crucial in these cases. Frequently, it will be difficult to assess from motion papers alone what actual hardship will occur upon deportation in a given case. Therefore, so long as the motion papers do provide objective facts to support a reasonable likelihood of extreme hardship, we do not require a showing that the facts, if true, definitively establish extreme hardship.

We acknowledge our prior decisions holding that the moving party generally bears a heavy burden in seeking reopening of proceedings. *Matter of Ige, supra; Matter of Coelho, supra.* The Supreme Court has also recognized this heavy burden. *See INS v. Doherty, supra; INS v. Abudu, supra*. However, this principle does not require a conclusive showing on elements of eligibility which involve the exercise of judgment, such as the extreme hardship requirement for suspension of deportation.

We further note that in those cases where we have emphasized the heavy burden of proof faced by an alien seeking reopening, the facts warranted the strict imposition of such a burden. In *Matter of Coelho, supra*, for example, the alien had already had an opportunity to fully present and litigate his request for discretionary relief from deportation under section 212(c) of the

Act, 8 U.S.C. § 1182(c) (1988). He sought a remand for further consideration of the section 212(c) application. We held that "in cases such as this," reopening should not be granted unless the alien had met the "heavy burden" of showing that the new evidence presented "would likely change the result in the case." *Id.* at 473.

In another case, *Matter of Reyes*, 18 I&N Dec. 249 (BIA 1982), the alien had entered the United States in October of 1968, had been ordered deported in May of 1970, and had been granted 30 days' voluntary departure. She did not depart, but went into hiding and filed a motion to reopen to apply for suspension 9 years later, in July of 1979. We held that "under the factual background of cases such as this, we consider it warranted and reasonable to require a clear, unambiguous showing of evidentiary support to justify reopening." *Id.* at 251.

Many motions to reopen, however, do not present these special, adverse considerations. Where an alien is seeking previously unavailable relief and has not had an opportunity to present her application before the Immigration Judge, the Board will look to whether there is sufficient evidence proffered to indicate a reasonable likelihood of success on the merits, so as to make it worthwhile to develop the issues further at a full evidentiary hearing. *See Matter of Sipus, supra.*

The case before us presents none of the more egregious factors present in such cases as *Matter of Coelho, supra*, and *Matter of Reyes, supra*. The absence of any dilatory tactics in this case is a proper matter for our consideration. *See generally Blanco v. INS, supra; Matter of Pena-Diaz, supra.*

## IV. THE RESPONDENT'S MOTION

With these considerations in mind, we turn now to the question of whether the respondents in this case have made a prima facie showing of extreme hardship sufficient to warrant reopening of their deportation proceedings. We find that such a showing has been made, and we therefore reopen the proceedings.

As mentioned above, the respondents have remained in the United States continuously since their entries in 1988 and 1986. The adult respondent now also has a 6-year-old United States citizen child. The minor respondent has now lived here for most of her life. In support of the motion to reopen, the respondents filed individual applications for suspension of deportation. The applications are supported by affidavits, letters, and other documentation. An affidavit submitted by the adult respondent states that she would be unable to get a job comparable to the one she has in this country, because the economic situation in Nicaragua is "unbearable." The affidavit also states that her daughter would suffer extreme hardship upon deportation because she has lived in this country since the age of 6, speaks English better than Spanish, and "feels as American." The respondent further states that her 6-year-old

citizen son would suffer hardship if he accompanied his mother to Nicaragua because he also feels American, only speaks English, and now attends school. Moreover, it is alleged that the medical assistance and economic situation in Nicaragua are "chaotic."

The adult respondent's affidavit is not artfully drawn and we note the dissent's concern over the claim that her 6-year-old son speaks only English. However, even discounting the alleged language abilities of the citizen child, we find the affidavit, together with the underlying facts of the case and the other documentation offered in support of the motion, sufficient to establish a prima facie case of extreme hardship. Our conclusion is primarily based on several critical factors.

First, the minor respondent has now lived in this country since the age of 6. She has essentially grown up in the United States. All her education has been here. Life in Nicaragua would likely be completely foreign to her now in every respect. The degree of her integration into the society of the United States is a proper matter for consideration on remand. *See Matter of O-J-O-*, 21 I&N Dec. 381 (BIA 1996). Her claim that she does not speak Spanish well may also be explored at the reopened hearing.

Second, the adult respondent's citizen child, while still of tender years, has now begun school. There is nothing in the record to suggest that he could remain in the United States with another relative or friend, even if his mother would consider such a course of action.

Third, Nicaragua is an extremely poor country, still in political turmoil, with a shattered economy, very high unemployment, and minimal government services. The employment prospects for the adult respondent and the opportunities for further education for the minor respondent and her United States citizen brother will not simply be less in Nicaragua than in this country: their opportunities will be vastly diminished if they are returned to one of the poorest countries in the Western Hemisphere.

Fourth, as discussed above, it appears that the respondents have been covered since 1987 by the Nicaraguan Review Program. Under that program, essentially no Nicaraguan nationals were deported, and virtually all were granted employment authorization. Even now, work authorization is authorized for those Nicaraguans who have applied for suspension of deportation and who meet the 7 years' physical presence requirement for that relief. As we recognized in *Matter of Pena-Diaz, supra,* where the Service affirmatively indicates that it does not intend to deport an alien, the alien's reliance on that fact can "contribute to the respondent's other allegations of hardship." *Id.* at 847. This consideration may not necessarily be of particular significance in any given case. However, it is one factor which may be considered in assessing hardship as a whole. We further note in this regard that the Service itself has recognized that the Nicaraguans who have lived here for many years under color of law may face hardship upon their return. *See* Immigration and Naturalization Service Fact Sheet 5 (June 2, 1995).

In and of themselves, each of these factors may not have been sufficient to warrant reopening. Nor will we speculate in this case as to whether the absence of any one of these factors would or would not have been be fatal to the motion. However, the facts just mentioned, considered as a whole, convince us that it is worthwhile to develop the extreme hardship issue further at a full evidentiary hearing before the Immigration Judge.

We caution that this decision is not a determination that the respondents should be granted suspension of deportation as a matter of law or discretion. That decision rests with the Immigration Judge after the respondents have had the opportunity to present all evidence and arguments in favor of their applications for suspension of deportation.

Accordingly, the motion to reopen will be granted.

**ORDER:** The motion to reopen is granted, the proceedings are reopened, and the record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion, and for the entry of a new decision.

*DISSENTING OPINION:* Lauri S. Filppu, Board Member, in which Fred W. Vacca and Michael J. Heilman, Board Members, joined

I respectfully dissent.

This case involves an adult female respondent, who came here at age 30 and has 8 years' residence in Florida, and her 15-year-old daughter, who traveled with an aunt and arrived here, ahead of the mother, about 10 years ago at age 6. This family now includes a 6-year-old United States citizen child. The respondents would be returning to a poor country, Nicaragua. The family would experience a reduced standard of living and would encounter the other difficulties associated with adjustment and readjustment to life in another society. The majority finds that the respondents have made a prima facie showing of statutory eligibility for suspension of deportation on the basis of these circumstances and the existence of the Nicaraguan Review Program.

This Board recognized over 30 years ago that the term "extreme hardship" is "not a definable term of fixed and inflexible content or meaning. It necessarily depends upon the facts and circumstances peculiar to each case." *Matter of Hwang,* 10 I&N Dec. 448, 451 (BIA 1964). Indeed, deportation will involve some hardship to almost every alien, but a wide spectrum of hardships will be encountered depending on the facts of the various cases. The majority recognizes these principles, but they generously accord weight to hardship factors which do not rise to the level of extreme.

Further, the majority fails to identify which, if any, of the qualifying persons have made a prima facie showing of extreme hardship. It is not clear whether the majority finds that the alien respondents and the citizen child each independently has a reasonable likelihood of suffering extreme hardship in Nicaragua, or whether it finds the hardships to all of the qualifying

individuals in the aggregate make out a case for reopening. This question, moreover, is not unimportant in a case that is being issued as guidance for Immigration Judges and the public. For example, if the adult respondent has made a showing of hardship to herself that is sufficient for reopening, it is likely to affect other cases involving aliens who arrived here as adults, have 8 years' residence here, and would be returning to poor countries.

On the other hand, aggregating the hardships would appear to run contrary to the mandate of the statute. The extreme hardship requirement is not satisfied by adding together the individual, but not "extreme," hardships of all members of a family. There must be at least one person whose individual hardship can be said to be "extreme," and who satisfies the affinity requirements of the statute. The majority may mean that the adult respondent's motion prevails because of possible hardship to the citizen child, and that the minor respondent has her own qualifying claim. But if so, the majority ought to make this clear.

In this respect, section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1) (1994), requires that the suspension applicant prove that her deportation would, "in the opinion of the Attorney General, result in extreme hardship to the alien or to [her] spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." The adult respondent must show extreme hardship to herself or her citizen child. The minor respondent must show extreme hardship to herself. Collective family hardship, while relevant as to the exercise of discretion, does not make out a case for statutory eligibility.

As this case involves a motion to reopen, the precise question before the Board is whether a prima facie showing of extreme hardship has been made. The majority does not find that extreme hardship has actually been established here. It only concludes that there is a reasonable likelihood of success, such that it would be worthwhile to develop the issues at a full evidentiary hearing. The prima facie case concept evidently has at least two meanings: 1) that the evidence is "sufficient to render reasonable a conclusion in favor" of the asserted contention, and thereby allow the claim to go to the trier of fact; and 2) that the "evidence compels" a particular conclusion if the opposing party fails to produce evidence in rebuttal. *Black's Law Dictionary* 1189-90 (6th ed. 1990). I understand the majority to be using the first of these meanings, such that a grant of reopening does not "compel" a finding of extreme hardship in the absence of contradictory evidence from the Immigration and Naturalization Service.

Nevertheless, the assessment of a "prima facie case of extreme hardship" is inextricably linked to the meaning of "extreme hardship" itself, even if we mean that a finding of the requisite hardship is merely reasonable, as opposed to being compelled, on the strength of the presentation made in the motion. The concept of a prima facie case must be measured against the ultimate statutory requirement in order to have practical meaning.

In analyzing the concept of "extreme hardship," we are instructed by the actual language of the statute. One of the definitions of the term "extreme" is "being in a very high degree," "extending far beyond the norm," or "of the greatest severity." *See Webster's II New Riverside University Dictionary* 457-58 (1984); *cf. Matter of O-J-O-*, 21 I&N Dec. 381 (BIA 1996) (Filppu, dissenting) (offering yet another, similar dictionary definition). The choice of the word "extreme," in contrast with other possible adjectives, is consistent with Congress' goal of limiting the availability of suspension of deportation for aliens who manage to remain here for a number of years or who acquire ordinary ties to United States citizens, while providing relief for those who exhibit hardships "far beyond the norm."

The legislative history of section 244 of the Act, the Board's practice over the last two or more decades, and the Supreme Court's and Congress' implicit endorsement of a narrow view of the term "extreme hardship" support an interpretation that is consistent with the ordinary meaning of the word "extreme." *See* S. Rep. No. 1137, 82d Cong., 2d Sess. 25 (1952); H.R. Rep. No. 1365, 82d Cong., 2d Sess. 62-63 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1718; *INS v. Rios-Pineda*, 471 U.S. 44 (1985); *INS v. Jong Ha Wang,* 450 U.S. 139 (1981); *Matter of Ige*, 20 I&N Dec. 880 (BIA 1994); *Matter of Kim,* 15 I&N Dec. 88 (BIA 1974); *Matter of Sipus,* 14 I&N Dec. 229 (BIA 1972); see also *Matter of O-J-O-, supra* (Filppu, dissenting), for a detailed discussion of the above. Although the Board's longstanding interpretation of extreme hardship has not been a generous one, it is consistent with the literal language of the statute. It is with this benchmark for "extreme hardship" that I examine whether the respondents have made their case for reopening.

Contrary to the majority, I find that the respondents have not met their burden of showing a reasonable likelihood of extreme hardship either to themselves, or, in the case of the adult respondent, to her United States citizen son.

The respondents have presented unpersuasive, and in one instance, questionable evidence of hardship in support of the motion. The adult respondent asserts that she would suffer extreme emotional, economic, and political hardship if she is returned to Nicaragua. She claims that she would be unable to get a "good job" in Nicaragua like the one she has in this country on account of her seniority and the adverse economic conditions in her native country. The adult respondent also alleges that both she and her daughter would endure such hardship because her daughter, the minor respondent, came to the United States when she was 6 years old. The mother asserts that her daughter would suffer extreme emotional hardship because "she is adapted to the American system and she speak[s] English better than Spanish and she feels as American." Further, the mother claims that her son, a United States citizen, would suffer emotional and economic hardship if he leaves this country and goes to Nicaragua where the medical assistance and the economic situation are chaotic. Finally, she claims that her son is attending school and "only speaks English and he feels as American."

The record reflects that the adult respondent has been in the United States since her April 1988 entry. She thus exceeds the statutory 7 years' continuous physical presence requirement by only 1 year. She has worked steadily and has remained with her present employer for 4 years. She attends a church and has made acquaintances during that time. Further, she gave birth to her son in this country. She claims that economic conditions in Nicaragua are worse than in the United States. I find nothing in her motion or in the record which demonstrates a reasonable likelihood that her deportation would result in personal extreme hardship. She resided in Nicaragua until the age of 30. She was steadily employed in Nicaragua despite the political turmoil of the time; she even completed her high school education and had a semester of college. Her father still resides in her native country. Although her mother and siblings are in the United States, they do not have lawful status, and she places no reliance on them in her motion papers. There has been a beneficial change in the political climate in Nicaragua. Although there will undoubtedly be some financial hardship to the adult respondent as a result of deportation, she offers no evidence to show that it would be severe. Further, I do not find that these factors either individually or cumulatively demonstrate a reasonable likelihood that she would personally endure extreme hardship.

In addition, it has not been demonstrated that the adult respondent's United States citizen son has a reasonable likelihood of suffering extreme hardship upon his mother's deportation. He is 6 years old. I find somewhat disingenuous the mother's claim that he "only speaks English" given the mother's own lack of English language skills. At the time of her asylum hearing in April 1992, she testified that she did not speak English, and in fact required a Spanish language interpreter. Her son was then almost 3 years old, and he must have communicated with his mother, both at that time and for at least sometime thereafter, in her native tongue, Spanish. I therefore will not credit this "English language" claim of hardship to the son without further clarification or an explanation. In any event, he is still young and should be able to adapt to a new culture and even a "new" language in Nicaragua. His half-sister, the minor respondent, apparently adapted to the language and culture in this country, when she left her native land at the age of 6, the same age as is the son today. I recognize there will be some economic disadvantages, and the medical care and educational opportunities are not likely the same in Nicaragua. Nonetheless, on this record there is nothing to distinguish this adult respondent and young citizen child from any other similar parent and young child who are facing a return to a country experiencing the economic circumstances of Nicaragua in 1996.

With respect to the minor respondent, I first note that she has been in this country approximately 10 years. She entered the United States at the age of 6, has continued to grow up in this country, allegedly speaks English better than Spanish, and has attended school here. She, more than her mother or brother, may suffer the greatest immediate hardship upon her return to her native

country because of the obvious change in lifestyle and culture after 10 formative years in the United States. However, she speaks Spanish, spent her first 6 years in Nicaragua, and is young enough to acculturate herself. The record noticeably does not contain an affidavit by the minor respondent, who, at age 15 1/2 and having the assistance of counsel, should be able to help explain her own circumstances. The only evidence presented on the daughter's behalf is her suspension application and record of school enrollment. On this record there is no showing that she will endure severe financial or educational hardships if required to return to her native country. Although the hardships that would be encountered by the minor respondent are significant, there is insufficient evidence on this record to make a showing of a reasonable likelihood of extreme hardship.

The respondents do *not* rely on either the Nicaraguan Review Program or our decision in *Matter of Pena-Diaz,* 20 I&N Dec. 841 (BIA 1994), in their motion papers. They claim no special hardship that arises from any possible past governmental forbearance in relation to their circumstances. The majority references *Pena-Diaz* and the Nicaraguan Review Program, and uses them as favorable discretionary factors. The majority also notes them in relation to hardship, yet it fails to explain how either the Nicaraguan Review Progam or *Pena-Diaz* may enhance the respondents' hardship in this particular case. I would require an affirmative explanation, preferably coupled with some showing of actual reliance on the Nicaraguan Review Program, before even speculating on the direct application of *Pena-Diaz* to the hardship issues in this case.

In sum, the respondents have shown nothing outside the normal hardship that is routinely experienced by members of a family that have been here a little over the statutory minimum of 7 years and are returning to one of the world's less affluent nations. In my view the respondents have not made a prima facie case of extreme hardship. Accordingly, I would deny the motion to reopen.