[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 04-13923 & 05-12775

_____

BIA No. A79-400-291

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 24, 2006
THOMAS K. KAHN
CLERK

CLARA AURORA VERANO-VELASCO,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petitions for Review of a Decision of the
Board of Immigration Appeals

_____

**(July 24, 2006)**

Before ANDERSON, FAY and SILER,* Circuit Judges.

_____

*The Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

PER CURIAM:

This is an immigration case in which petitioner, Clara Aurora Verano-Velasco (Verano), seeks review of the Board of Immigration Appeals' ("BIA") final order affirming, without opinion, the Immigration Judge's ("IJ") decision denying Verano's applications for asylum, withholding of removal, and protection under the Convention Against Torture. On appeal, Verano argues that (1) The BIA erred in denying her motion to reconsider the IJ's decision, and (2) The BIA erred in denying her motion to reopen based on newly discovered evidence regarding the government's witness, Rene Lopez. We agree with the appellant's argument that the BIA erred in denying her motion to reopen. We reverse and remand this case for a supplemental hearing based on the new evidence.[1]

## I. Background

On May 18, 2001 Verano, a citizen of Colombia, arrived at the Miami International Airport without papers authorizing her admission. At that time, she provided a sworn statement to an INS officer stating that her purpose in entering the United States was to attend custody proceedings regarding her daughter, a United States citizen. She also stated that the last time she came to the United

---

[1] This ruling is based upon appellant's motion to reopen, therefore, we do not reach the remaining issues on appeal. However, the effect of this reversal is that the entire case is remanded for further proceedings and reconsideration.

States was in May 2000, and she stayed for one year. She stated that she left Colombia because guerrillas killed her brother and kidnaped her sister, and that she was afraid of what might happen to her. She stated that she had not previously asked for asylum "because of [her] parents."

On May 25, 2001, Verano stated the following at her credible fear interview: (1) she was not a member of any political organization; (2) her father was a police officer who had campaigned for the Conservative Party and her uncle was a mayor; (3) on May 10, 2001, the Revolutionary Armed Force of Colombia ("FARC") attacked, drugged, abducted, tortured, and raped her sister because of her father's work with the police; (4) on September 20, 1999, her brother was killed during an attempt to kidnap him; and (5) her family was threatened because the guerillas knew that she was in the United States with her child. The INS found that Verano had established a credible fear of persecution based on her political opinion.[2]

On May 29, 2001, the Immigration and Naturalization Service ("INS")[3] served Verano with a Notice to Appear, which charged her as an alien subject to

---

[2] This was a preliminary finding that merely allowed Verano to go forward.

[3] The Homeland Security Act ("HSA"), effective November 25, 2002, created the Department of Homeland Security ("DHS") and abolished the INS. Pub. L. No. 107-296, 116 Stat. 2135. The HSA transferred INS functions to the DHS. This case was initiated by the INS while still in existence. We therefore refer to the INS rather than the DHS as the relevant agency.

removal from the United States pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I), INA § 212(a)(7)(A)(i)(I).

On December 13, 2001, at an initial hearing before the IJ, Verano conceded removability and indicated that she would file an application for asylum. On April 4, 2002, Verano filed an application for asylum and withholding of removal, claiming that she and her family had been persecuted by the FARC guerrillas in Colombia on account of their political opinion and membership in a particular social group. Specifically, she claimed that two of her sisters were attacked by guerrillas and that her brother was murdered by one.[4] She stated that her greatest fear was for her 6-year-old daughter's life. Furthermore, she stated that, (1) she had entered the United States many times between 1991 and 2002; (2) before her most recent entry in the United States, on May 18, 2001, she last entered the United States on February 7, 1999; (3) her daughter, Nicole, last entered the United States in October 1996; (4) she resided in Florida from October 1996 through July 2001, and from November 2001 to the present; (5) she was employed in Florida at Colline USA from October 1996 through June 2001; at Braman Motors from July 2000 to October 2001; and at Bataglia from November 2001 to the present.

---

[4] The record contains a "civil registry of death" indicating that Jose Hildardo Verano Velazco died in September 20, 1999.

Verano filed an affidavit in support of her application stating that: (1) her father was a police officer; (2) the guerrillas placed threatening phone calls to her family and sent them "black lists" with her father's name on them; (3) her family campaigned for her mother's half-brother, Armando Burgos, who was a member of the Conservative Party running for mayor; (4) Burgos was elected mayor but because he was persecuted by the guerrillas, he resigned his position and moved to Chile. In the affidavit, Verano also described an incident relating to her sister, Celinda. She stated that in April 20, 1999, Celinda's car was stolen and that afterward, Celinda received a call from someone seeking to negotiate a price for the return of her car, which she suspected may have been a scheme by the guerrillas to kidnap her. Celinda did not notify the police about this incident because she did not believe the police would protect her. Furthermore, Verano claimed that on May 8, 1999, her sister, Aceved, was beaten and raped by the FARC, and questioned as to her uncle's political activities.[5]

At a subsequent hearing, Verano testified to roughly the same issues addressed in both her affidavit and in her previous statements. Specifically, she

---

[5] Verano attached police reports regarding the incidents with her sisters. The reports indicate that Celinda was the victim of a theft and that Aceved was the victim of an offense described as "violent carnal access" for which she spent 28 days in recovery. The reports contain no information regarding the motive behind these occurrences.

testified that prior to her arrival in May 2001, she had lived in the United States since 1996. She testified that she did not want to risk her life by staying in Colombia because members of her family had suffered persecution there. Verano indicated that her asylum claim was based on the mistreatment of her family members who have remained in Colombia. Verano conceded that she herself was never kidnapped, arrested, shot at, or otherwise harmed in Colombia. Verano stated that she first brought her daughter to the United States in 1996 to visit her child's father, and that since 1996, she has taken her daughter back to Colombia at least two times.

Furthermore, Verano testified that she had been a member of the Conservative Party in Colombia since childhood, and that her family began receiving threats in 1985 or 1986. She said that the initial threats were related to her father's employment as a police officer responsible for protecting her village from the guerillas, and that her uncle also received threats from guerillas attempting to extort money from him.

Verano testified that in May 1999, her sister was abducted at gun point by four men who apprehended her as she left her apartment. She said that her sister was threatened, tortured, and raped by individuals who questioned her about her father's employment as a police officer. She said that her sister was held for three

6

days, and spent nine days recovering at a hospital.

Verano reiterated her previous statements regarding her brother, testifying that in September 1999, he was shot and killed by guerillas because of her uncle's political activities and her father's employment as a police officer. Verano further testified that her family has continued to receive threats from guerillas since her May 2001 arrival in the United States.

The government called Rene Lopez, the father of Verano's child, to testify against her. Verano's attorney objected on the grounds that she was not given proper notice that Lopez would be testifying.[6] The government responded that the testimony was for impeachment purposes only, and the IJ overruled the objection. Lopez proceeded to contradict Verano's testimony on several grounds. He testified that there were no threats directed against him, Verano, or their daughter that caused them to bring their child to the United States. He further testified that there was no indication at the time of the incident involving Verano's sister, that the perpetrators of the assault were guerillas, or that she had been targeted on account of her uncle's political activities or her father's employment as a police officer. He stated that

___

[6] The Immigration and Nationality Act states that an alien in removal proceedings "shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government." INA § 240(b)(4)(B), 8 U.S.C. § 1229a(b)(4)(B). Furthermore, the United States Immigration Court local operating rules require that a witness list be filed with the Immigration Court at least 10 days prior to the hearing, along with a brief proffer of the anticipated testimony.

likewise, there was no indication that Verano's brother was murdered based upon his political affiliations. Lopez also described the circumstances surrounding a claim of child sexual abuse which he had filed against Verano in family court.

Following Lopez's testimony, the IJ indicated that she was inclined to find Verano's application frivolous, but that she would allow Verano's counsel to ask Lopez a few questions. The IJ also stated that she would give Verano an opportunity to rehabilitate her application. Counsel moved for a continuance to have time to cross-examine Lopez, noting that she had not had a chance to inquire about his criminal record, and that she also wished to bring in a rebuttal witness. The IJ denied the continuance. Counsel then proceeded to cross-examine Lopez.

In an oral decision dated January 7, 2003[7], the IJ found Verano's asylum application frivolous. The IJ based this decision on a totality of the circumstances, specifically taking into account perceived inconsistencies between Verano's testimony and her application.

In her decision, the IJ noted how Lopez's testimony contradicted Verano's statements. For instance, with respect to Verano's testimony about her sister, the IJ noted that, "[t]he father of the respondent's daughter, a United States citizen by the name of Rene Lopez, has indicated under oath that his understanding of the incident

_____

[7] Although the decision was oral, the record contains a written transcript of this decision.

through information he received from respondent, who was the one who received the information on the telephone, was that the sister had been drugged. She had been out drinking with some individuals and that she had been raped and that this was a very serious problem and that he did not understand that there was any connection to the guerrilla either."

In addition, the IJ considered Lopez's testimony in determining the validity of Verano's claims regarding the death of her brother, noting that, "[t]he father of respondent's child also testified that...his understanding of the incident was that the brother and the father had been out drinking and apparently, they were returning home on the street. There was an altercation of some sort with some individuals and the brother was shot at that particular time because of that," as opposed to Verano's contention that her brother was killed for political reasons.

Finally, the IJ noted that she was mindful that Verano and Lopez had a contentious relationship, and that "[t]here has been apparently an arrest of the respondent herself in some sort of domestic violence situation."

On February 6, 2003, Verano appealed the frivolity ruling to the BIA. On July 7, 2004, the BIA affirmed the IJ's decision.

On August 6, 2004, Verano filed a motion to reconsider with the BIA, citing violations of due process during her removal proceedings. While this motion was

9

pending, Verano filed a motion to reopen with the BIA based on new evidence relating to family court proceedings. A family court order dated February 23, 2003 indicates that the investigating detective determined Lopez's charges against Verano of child sexual abuse were unfounded. Furthermore, a transcript of the family court proceedings reveals that the family court vacated a default judgment in favor of Lopez, finding that it had been obtained fraudulently. A circuit court order dated July 1, 2003 characterized Lopez's allegations of Verano's sexual abuse as false and potentially damaging to their child.

On April 18, 2005, the BIA denied Verano's motions to reconsider and to reopen. Verano now appeals.

## II. Analysis

We review the BIA's denial of appellant's motion to reopen for an abuse of discretion. Assa'ad v. U.S. Atty. Gen., 332 F.3d 1321, 1341 (11th Cir. 2003). BIA regulations state that "[a] motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at a former hearing." 8 C.F.R. § 1003.2(c)(1). A motion to reopen must be supported by affidavits or other evidentiary material, and it must state new facts that will be proven at a hearing to be held if the motion is granted. Rios-Cano v. U.S. Atty. Gen., 151 Fed. Appx. 916,

10

921 (11th Cir. 2005). Because the evidence Verano offered in her motion to reopen was unavailable at the time of her previous hearing, and because that evidence substantially calls into question the credibility of a witness who was material to the IJ's assessment of Verano's application, we conclude that the BIA erred in denying Verano's motion to reopen.

The government argues that the evidence upon which Verano bases her motion to reopen is neither material nor new. First, they argue that because the family court proceedings concluded prior to the BIA's July 7, 2004 decision, it does not qualify as new evidence for purposes of Verano's motion to reopen. The family court evidence, however, constitutes new evidence because it was unavailable at the time of Verano's hearing in front of the IJ. Verano's motion should be granted if the evidence offered was unavailable or could not have been presented at her former hearing. Verano's final immigration court hearing took place on January 7, 2003, and she has not had a hearing since that time. The immigration court evidentiary record was completed as of that date. The family court evidence Verano seeks to introduce was not available at that time, therefore, the evidence should be considered "new" under § 1003.2(c)(1).

Furthermore, the evidence Verano seeks to introduce is material to her application for asylum. The government argues that the evidence is immaterial

because the IJ based her decision on a totality of the circumstances and thus, her conclusion is supported by evidence that would remain unaffected by the introduction of the family court evidence. We disagree. The family court evidence is material because it bears upon the credibility of a key witness, whose testimony seems to have substantially bolstered the IJ's frivolity ruling. Although we do not reach the question of frivolity in this opinion, it is clear from the record that the IJ accepted Lopez's testimony over that of Verano's. We can think of nothing more crucial to an evaluation of the credibility of Verano than a full consideration of the character and credibility of Lopez. The new evidence is therefore material to the very crux of the application for asylum.

## III. Conclusion

We conclude that the BIA erred in denying appellant's motion to reopen. Although appellant faces a heavy burden in this case, we find that her burden has been met with proof that the evidence presented was both unavailable and material to her case. The new evidence calls into question the credibility of a witness upon whose testimony the IJ relied substantially in determining that appellant's application was frivolous. A ruling of frivolity against an asylum applicant carries serious consequences, and it is questionable whether a determination of frivolity could be reached in the absence of Lopez's testimony.

The BIA's denial of appellant's motion to reopen is therefore **REVERSED** and the matter is **REMANDED** for a new hearing before the Immigration Judge.