[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 23-10924

Non-Argument Calendar

————————————————

NICOLAS ELPIDIO MANBRU-ENCARNACION,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

————————————————

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A030-850-491

————————————————

Before GRANT, BRASHER, and ABUDU, Circuit Judges.

PER CURIAM:

Nicolas Elpidio Manbru-Encarnacion petitions for review of an order of the Board of Immigration Appeals ("BIA") denying his motion to reopen his removal proceedings. He argues that he presented the BIA with sufficient new evidence to warrant reopening the proceedings on his application for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 1208.16(c). He also argues that he was prejudiced by the ineffective assistance of his counsel. After careful review, we deny the petition for review.

### I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Manbru-Encarnacion, a native and citizen of the Dominican Republic, was admitted to the United States as a lawful permanent resident on or about June 8, 1972. He was last admitted to the United States on November 22, 1992, in New York, New York. In 2018 and 2019, the Department of Homeland Security served him with documents alleging that he was removable on various grounds. After several continuances, Manbru-Encarnacion, represented by counsel, conceded that he was removable as charged. He conceded that he had convictions for grand larceny, criminal possession of a weapon, obtaining a credit card through fraudulent means, conspiracy to commit robbery and robbery, and making a false statement in an application for a passport.

Manbru-Encarnacion applied for relief from removal under the CAT. His application stated that he had received death threats in the past from Cesar Perez, Santiago Luis Polanco ("Yayo"), Benji Herrera, and other members of "the Wild Cowboys" gang ("TWC") because he had cooperated with the United States government as a confidential informant. He argued that these individuals would kill him and his family if he were to return to the Dominican Republic because there was a bounty on his head for his work as a confidential informant.[1]

Manbru-Encarnacion submitted evidence in support, including a letter from the Federal Bureau of Investigation ("FBI") which stated that he had been a confidential informant but that it was not currently aware of any threats of injury to him if he were deported to the Dominican Republic. He also submitted various news articles and documentary evidence about TWC and the leaders of the gang. Declarations by several individuals in the Dominican Republic represented that Yayo had influence in the current government of the Dominican Republic and Perez worked at the airport and had government connections as well. Country conditions evidence showed that, while the government had acted to punish officials who committed human rights abuses, there were reports of

---

[1] Manbru-Encarnacion's initial application also presented claims based on his religion. However, he did not press his religion-based claim, either before the agency, in his motion to reopen, or before us. Thus, that claim is abandoned. *See Alkotof v. U.S. Att'y Gen.*, 106 F.4th 1289, 1295 n.9 (11th Cir. 2024).

official impunity, corruption, and the torture, beating, and physical abuse of detainees and prisoners.

An affidavit from Manbru-Encarnacion explained that, in the late 1980s, he became a confidential informant with the FBI's New York Field Office. He had attended the same high school as individuals within TWC. Yayo was the leader of the gang and Perez was one of the men who helped Yayo launder money. In the 1990s, Manbru-Encarnacion assisted the FBI's investigation of a murder, served as a material witness, and was discovered to be such by members of TWC. He explained that, subsequently, a TWC member shot at him while he was driving. After he moved away from New York, Perez began calling his then-wife and threatening her. Perez told him that there was a price on his head and later he found out that, from another gang member, Perez had paid someone to stab him while he was in prison. After his release from prison, the threats continued, and Perez posted photos online of Manbru-Encarnacion with a noose around his neck.

Manbru-Encarnacion submitted emails apparently from Perez that reflected that he knew who Manbru-Encarnacion was and where he lived. The emails contained statements like "[y]our job is to steal from idiots and run and hide and my work is finding you to pay for what you stole from me," and "[w]e are investigating your whereabouts and where you are, we are going to let you know who is Nicholas Manbru-Encarnacion. A scammer, thief, con artist, a scourge, and an antisocial."

At a merits hearing in February 2020, Manbru-Encarnacion appeared but his retained counsel was not present. The attorney who did appear, an associate from the same firm, moved for a continuance to allow Manbru-Encarnacion's attorney to appear. The IJ denied the continuance, noting that the case had already been continued several times.

Manbru-Encarnacion then testified to the facts in his application. Relevantly, he stated that he did not have any associations with any cartels in the Dominican Republic and had never worked for a cartel, but he had received threats from them, as well as from people connected with the government. The threats warned that he and his family would be killed or tortured if they went to the Dominican Republic. He had been receiving threats since the 1990s, but, in 2009, after he and his now-ex-wife started a Christian ministry, the threats became so frequent that they would not answer their home phone. Individuals then started calling his ex-wife on her cell phone and "making all kind of threats and things like that, saying that [he] was a rat, and that they were going to kill [him], that they were going to kill [his] family, . . . and that they were just waiting for [him] to go to the Dominican Republic." He stated that "[t]hey have people working in the government with them." He clarified that he had been receiving threats from TWC for being a confidential informant for the FBI. He stated that TWC knew he was an informant because of corrupt cops on their payroll. Manbru-Encarnacion explained that a member of TWC "took a shot at" him and blew the back window off his vehicle. He moved

away from New York and later learned that TWC had put a price on his head.

Manbru-Encarnacion described how, when he lived in the Bronx, he had been kidnapped from his liquor store, and then was taken to the District Attorney's office in the Bronx, where he encountered cops that were associated with TWC. He then tried to relocate from New York to Florida, and then went to prison in 2005. He contended that people in the government knew he was in removal proceedings. He testified that, if returned to the Dominican Republic, he would be kidnapped and killed because of his cooperation. While he was in detention, he was visited by a special agent from the FBI who said he was concerned about him going back to the Dominican Republic, and also by an agent from the State Department who shared these sentiments. He also argued that the record evidence showed that TWC was dangerous and had power within the Dominican Republic. He emphasized that he believed that he would be killed if he returned to the Dominican Republic. When asked whether his family had ever been threatened, he responded that he had "always protected [his] family" and shielded his past from them, but he believed they would be put in danger if he was returned to the Dominican Republic.

While Manbru-Encarnacion was testifying and responding to questions from the IJ, retained counsel arrived and, after a short break, stated that she had been in contact with the FBI about Manbru-Encarnacion's informant work, and that she needed to make a formal request to the Attorney General. Manbru-Encarnacion's

counsel explained that she was seeking information about the connection between Perez and Yayo, and whether they were linked to the assistance that Manbru-Encarnacion had provided to the FBI. She argued that both men were aware of Manbru-Encarnacion's work as an informant, as shown by Perez's threats, and that Yayo was safe in the Dominican Republic, which showed that the government was protecting him. When asked about the lack of explicit threats in the emails from Perez, Manbru-Encarnacion's counsel responded that she thought "a lot of it [was] implied." When asked about the FBI letter that stated it was not currently aware of any threats of injury against Manbru-Encarnacion, she indicated that she was still looking for Manbru-Encarnacion's FBI file. She also acknowledged that, though his identity was alluded to, Manbru-Encarnacion was not directly named in the excerpts from the *Wild Cowboys* book. She again requested a continuance and the IJ granted the motion.

Before the continued merits hearing, Manbru-Encarnacion discharged counsel and, ultimately, appeared *pro se* at the continued merits hearing. At the second hearing, Manbru-Encarnacion submitted other evidence, specifically, excerpts from a book about TWC, additional emails from Perez, and country conditions evidence.

After the continued merits hearing, the IJ denied Manbru-Encarnacion's application. It first determined that, after considering the totality of the circumstances, Manbru-Encarnacion's testimony was not credible. It found that, while Manbru-Encarnacion

had provided in his application that he had received death threats in the past from Perez and testified that he was personally confronted by him in Washington Heights, he then testified on cross-examination that Perez did not harm or threaten to harm him during their encounter. As to Manbru-Encarnacion's reliance on the *Wild Cowboys* book as evidence his role as an informant was publicly known in the Dominican Republic, the IJ noted that Manbru-Encarnacion's name did not appear in any of the excerpts from the book. In other words, it found, there was no evidence of a connection between Manbru-Encarnacion and TWC. Next, while Manbru-Encarnacion testified that TWC knew his address and telephone number, the IJ noted that he had conceded that the gang never harmed or attempted to harm him while he was in Florida and that he was not fearful of the gang while he lived there. The IJ found the letter from the FBI to be "[m]ost damaging" to his credibility. It then noted that Manbru-Encarnacion had a history of making false statements to United States officials, as shown by his convictions for making false statements to obtain a passport and presenting himself as a United States citizen.

The IJ next found Manbru-Encarnacion's corroborative evidence unconvincing. First, it determined that, rather than bolstering his testimony, the letter from the FBI discredited Manbru-Encarnacion's claim of future harm. The IJ reiterated that the excerpts from *Wild Cowboys* did not name or identify him and found the emails that Manbru-Encarnacion presented as proof of threats to his safety did not contain threats. Finally, as to the letters containing information about criminals in the country, it decided that

these letters did not attribute their information to any source, much less a credible, objective one. The IJ found that Manbru-Encarnacion's corroborative evidence failed to overcome his disbelieved testimony and, when coupled with the adverse-credibility finding, the lack of reliable corroborative evidence doomed his CAT claim.

The IJ recognized that country conditions evidence showed corruption within the Dominican Republic government and a link between some government-sponsored security forces and torture of Dominican citizens. However, it found that this was not enough to meet Manbru-Encarnacion's burden of proof, as a pattern of human rights violations alone was insufficient to show that Manbru-Encarnacion was in danger of being tortured; there had to be evidence that he would be personally at risk of torture by or with the acquiescence of the government. It determined that Manbru-Encarnacion had not presented credible evidence to that effect and his claim was "overly speculative." Thus, it denied Manbru-Encarnacion's application and ordered him removed to the Dominican Republic.

Manbru-Encarnacion, still proceeding *pro se*, administratively appealed to the BIA. He stated that he had been detained throughout his removal proceedings and that he had provided vital evidence to his counsel that was never included in the record. He asserted that he had not received a copy of his file until April 1, 2020, and that he had not been properly prepared to testify. He

argued that he strongly believed that his record was incomplete and insufficient for the IJ to make an informed decision on his case.

Manbru-Encarnacion also filed a brief in support of his appeal claiming his counsel had been ineffective. He asserted that he did not receive proper preparation from his counsel prior to his final hearing, and that it was clear from the record that he was deprived of fair legal representation. He contended that he and his family had reached out to her via emails, phone calls, and letters, but that he never received any confirmation or acknowledgment of the receipt of these letters from his attorney. He argued that he had never been provided with the exhibits then presented on his behalf to the IJ, and that his counsel failed to present the *Wild Cowboys* book, which was vital evidence, and that counsel had failed to present other evidence that he had provided to her. He contended that his attorney had failed to appropriately inquire with the Attorney General as to his informant file. In support, Manbru-Encarnacion attached evidence, including: emails to his former counsel's office; a letter from his former counsel; excerpts from *Wild Cowboys*; the FBI's 2020 letter; a description by Manbru-Encarnacion of some of Perez's emails; several news articles; an excerpt from *Wild Cowboys* describing the methods of torture used by the Dominican Republic government; and a letter from Manbru-Encarnacion asking the agency to grant his application and raising claims about his attorney's representation.

In April 2021, the BIA dismissed Manbru-Encarnacion's administrative appeal. It explained that Manbru-Encarnacion did not

"meaningfully challenge the substantive grounds on which the [IJ] denied his application for protection under the CAT," abandoning the issue. Instead, it noted, Manbru-Encarnacion had raised a claim for ineffective assistance of counsel. However, the BIA denied that claim because Manbru-Encarnacion had not complied with the procedural requirements of *Matter of Lozada*, 19 I. & N. Dec. 637 (BIA 1988), *overruled in part by Matter of Compean*, 24 I. & N. Dec. 710, 710 (A.G. 2009), *reinstated*, 25 I. & N. Dec. 1 (A.G. 2009). Even if the procedural requirements of *Matter of Lozada* had been satisfied, it explained, Manbru-Encarnacion had not shown prejudice. Specifically, it noted that the IJ allowed the parties to thoroughly develop the record; allowed his former counsel to make arguments after arriving late to the merits hearing; and permitted Manbru-Encarnacion to provide more testimony and documents while proceeding *pro se*. Manbru-Encarnacion did not seek review of the BIA's April 2021 decision.

In June 2021, Manbru-Encarnacion, represented by counsel, moved to reopen. He argued that the evidence he had submitted showed that it was more likely than not that he would be tortured if he were removed to the Dominican Republic. He contended that errors by his attorney and by the IJ had prevented his case from being fairly heard. He alleged that there was a clear connection between the various TWC members that he had "snitched on and who he fear[ed] will kill him" in the Dominican Republic, and that those connections were substantiated by his affidavit, a letter from the FBI, emails, and excerpts from books describing TWC. He maintained that one or more persons in the Dominican Republic

connected to TWC—Cesar Perez, Yayo, and Ruben—will torture him "on account of [him] having worked as an FBI confidential informant." He reiterated that Cesar had directly threatened him twice and had stalked and threatened him over several years. He contended that men in the Dominican Republic would kill him, and the government would acquiesce to his torture. He further alleged that TWC members enjoyed impunity in the Dominican Republic and pointed to Yayo's short imprisonment for serious crimes there, which he argued showed acquiescence.

Manbru-Encarnacion also reiterated his contentions that his initial counsel was ineffective. He contended that his attorney failed to prepare him for his hearing, failed to promptly obtain evidence he needed, failed to appear on his behalf during the merits hearing, and allowed an associate who did not control or guide his testimony to conduct his direct examination. He contended that these failures prejudiced him and that he, essentially, was forced to appear *pro se* at his merits hearing. He explained that, had his attorney competently prepared his case and showed up on time, his CAT claim would have been clearly presented and would have been granted. Finally, Manbru-Encarnacion argued that he had satisfied the procedural requirements to bring an ineffective assistance claim under *Matter of Lozada*. Relatedly, he argued that the IJ abused its discretion in allowing his "stand-in" counsel to proceed with his case.

Manbru-Encarnacion also attached various evidence to his motion to reopen to corroborate some of his testimony, and to

elaborate on his ineffective assistance claim. More recent country conditions evidence showed that, while the government of the Dominican Republic had sought to punish officials who had committed human rights abuses, reports of official impunity and corruption remained widespread. Another affidavit by Manbru-Encarnacion described the facts of his testimony in greater detail and further described the threats he had received. A 2021 letter from the FBI stated that Manbru-Encarnacion had been an informant from 2001 to 2004, and that, while it was "not currently aware of any threats of injury, [he] could be exposed to risk should he be deported to the Dominican Republic given the nature of the assistance he provided." News articles, maps, and charts provided various details about TWC. However, according to a letter his former counsel filed in response to the ineffective assistance of counsel claim, counsel believed Manbru-Encarnacion's application lacked evidentiary support and that he had little chance of success on his CAT claim.

The BIA denied Manbru-Encarnacion's motion to reopen in February 2023. It noted that many of the submitted documents were duplicative of those the IJ considered. It concluded that, even if Manbru-Encarnacion's newly presented evidence was not previously available because of ineffective assistance of counsel, Manbru-Encarnacion had not established that this evidence was likely to change the outcome of his case. It concluded that Manbru-Encarnacion had not presented evidence to show that government officials in the Dominican Republic would consent or acquiesce to any harm committed against him by private actors in the country,

*e.g.*, TWC.  As to the other evidence relating to events in the 1990s and 2010, the BIA reasoned that it did not show that current Dominican government officials would consent or acquiesce to harm done to Manbru-Encarnacion.  It noted that the 2020 Human Rights Report revealed that the current Dominican government was trying to combat corruption by government officials.  Accordingly, the BIA concluded that Manbru-Encarnacion had not shown a sufficient likelihood that the new evidence would have changed the result in his case and that, similarly, but for his former counsel's deficiencies, he would have prevailed.  The BIA also declined to revisit its prior decision on the fairness of the proceedings before the IJ.

Manbru-Encarnacion timely petitioned for review of the BIA's decision.

## II. STANDARDS OF REVIEW

We review the BIA's denial of a motion to reopen for an abuse of discretion, although we "review any underlying legal conclusions *de novo*." *Dacostagomez-Aguilar v. U.S. Att'y Gen.*, 40 F.4th 1312, 1315 (11th Cir. 2022), *cert. dismissed*, 143 S. Ct. 1102 (2023). When reviewing for an abuse of discretion, we ask whether the BIA exercised its discretion arbitrarily or capriciously.  *Ferreira v. U.S. Att'y Gen.*, 714 F.3d 1240, 1243 (11th Cir. 2013).  The BIA can abuse its discretion by misapplying the law in reaching its decision, or by failing to follow "its own precedents without providing a reasoned explanation for doing so."  *Id.*  A petitioner bears a heavy burden to show arbitrariness or capriciousness in this context because

motions to reopen removal proceedings are disfavored. *Mei Ya Zhang v. U.S. Att'y Gen.*, 572 F.3d 1316, 1319 (11th Cir. 2009). We review the legal question of whether a petition for review is exhausted *de novo*. *See Morales v. U.S. Att'y Gen.*, 33 F.4th 1303, 1307 (11th Cir. 2022), *overruled in part on other grounds by Santos-Zacaria v. Garland*, 598 U.S. 411, 419-23 & n.2 (2023).

## III. ANALYSIS

On appeal, Manbru-Encarnacion first concedes that he never petitioned for review of the BIA's 2021 decision. Still, he argues that we must review his underlying administrative appeal that led to the 2021 decision in order to determine whether the BIA abused its discretion in denying his motion to reopen. He argues, specifically, that the IJ's adverse credibility finding should be given particular attention in considering his motion to reopen. In other words, he stresses, we must determine whether the evidence in the motion to reopen would have altered the adverse credibility determination in assessing whether it would change the outcome.

As to the merits of his ineffective assistance claim, Manbru-Encarnacion argues that the IJ and BIA erred in failing to consider the prejudice caused by the IJ's decision to proceed without his chosen counsel present. He asserts that the IJ also never determined whether his testimony, standing alone, supported a favorable credibility determination and, instead, determined the lack of corroborating evidence to be determinative. He states that the IJ never concluded that his testimony was internally inconsistent or inconsistent when compared with the other record evidence. He also

argues that his conviction for making false statements to obtain a United States passport "does not *ipso facto* mandate an adverse credibility determination." He maintains that the credibility determination was based on his inability to fully present his claim because of ineffective assistance and that this Court should grant his petition to allow him a meaningful opportunity to present his CAT claim.

As to the new evidence he submitted in his motion to reopen, Manbru-Encarnacion argues that he put forward a sufficient explanation of why the individuals he fears want to harm him and the reason the Dominican government would either assist or acquiesce in those harms. He argues that evidence in the record shows a pattern of human rights abuses in the Dominican Republic, and contends that the new evidence he submitted established that the government would approve or consent to those abusive practices being used against him.

The government, in response, states that Manbru-Encarnacion's petition for review fails for procedural and substantive reasons. Procedurally, it agrees that, because Manbru-Encarnacion did not petition for review of the BIA's prior decision, the sole question before this Court is whether the BIA abused its discretion in denying his motion to reopen. It asserts that Manbru-Encarnacion improperly raises challenges to determinations made by the agency in his first administrative appeal and fails to contest the BIA's decision on his motion to reopen, which concluded that he had failed

to demonstrate a *prima facie* case for CAT relief. It argues these arguments are unexhausted.

Substantively, the government argues that the BIA did not abuse its discretion in concluding that the new evidence Manbru-Encarnacion presented failed to demonstrate a sufficient likelihood of changing the result in his case. It asserts that much of the evidence that Manbru-Encarnacion presented to "materially enhance" his claim had already been reviewed by the IJ and found insufficient to meet his burden. The government further asserts that the evidence Manbru-Encarnacion submitted was largely duplicative, and none of it established an objective, direct link between him and TWC or its members, or established a direct link between Perez and TWC or Yayo. It contends that the evidence also failed to establish that the Dominican government would consent or acquiesce to any feared harm by TWC. It maintains that, even with other evidence of threats, Manbru-Encarnacion failed to show a reasonable likelihood of changing the outcome of his case. It reiterates the BIA's observation that the current country conditions that Manbru-Encarnacion presented with his motion did not support his claim because it reflected that the Dominican Republic was affirmatively trying to combat corruption, even if its efforts had not been successful. It asserts that governmental ineffectiveness at preventing private actors from torturing others is not official acquiescence. It argues the BIA reasonably concluded that the record did not demonstrate a government official in the Dominican Republic would consent or acquiesce to any harm to Manbru-Encarnacion.

*A. Exhaustion*

Section 1252(d)(1) of the INA provides that a court can re-view a final order of removal only if the noncitizen "has exhausted all administrative remedies available to the [noncitizen] as of right." INA § 242(d)(1), 8 U.S.C. § 1252(d)(1). We have held that "[a] petitioner has not exhausted a claim unless he has both raised the core issue before the BIA, and also set out any discrete argu-ments he relies on in support of that claim." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 800 (11th Cir. 2016) (citations and internal quotations omitted), *overruled in part on other grounds by Santos-Zacaria*, 598 U.S. at 419-23 & n.2.[2] However, exhaustion is "not a stringent requirement." *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1297 (11th Cir. 2015), *overruled in part on other grounds by Santos-Zacaria*, 598 U.S. at 419-23 & n.2. "Simply put, petitioners must have previ-ously argued the 'core issue now on appeal' before the BIA." *Id.* (quoting *Montano Cisneros v. U.S. Att'y Gen.*, 514 F.3d 1224, 1228 n.3 (11th Cir. 2008)). Section 1252(d)(1)'s exhaustion requirement is a claims-processing rule, so we generally apply it when it has been asserted by a party. *Kemokai v. U.S. Att'y Gen.*, 83 F.4th 886, 891 (11th Cir. 2023).

Here, the government argues that aspects of Manbru-Encar-nacion's petition for review are unexhausted, specifically because

---

[2] In 2023, the Supreme Court held that the obligation to exhaust administra-tive remedies in § 1252(d)(1) is a claims-processing rule, not a jurisdictional limitation, and is subject to waiver and forfeiture, overturning our prior prec-edent to the contrary. *Santos-Zacaria*, 598 U.S. at 419-23 & n.2.

Manbru-Encarnacion did not petition for review of the 2021 BIA decision. We conclude Manbru-Encarnacion's arguments are exhausted. In his motion to reopen, Manbru-Encarnacion asked the BIA to consider his new evidence in light of the IJ's original rulings and, thus, his request that we do the same is part of the "core issue now on appeal." *Indrawati*, 779 F.3d at 1297. Of course, as both parties agree, we lack jurisdiction to "review earlier trips through immigration proceedings." *Bing Quan Lin v. U.S. Att'y Gen.*, 881 F.3d 860, 870 (11th Cir. 2018). However, we may consider Manbru-Encarnacion's arguments about the underlying proceedings in determining whether the BIA acted arbitrarily or capriciously in rejecting his arguments about those proceedings in his motion to reopen. *Ferreira*, 714 F.3d at 1243. We, therefore, turn to the merits of that question.

### B. Motion to Reopen & Ineffective Assistance of Counsel

To be eligible for CAT relief, an applicant must show that he more likely than not will be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c)(2); *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242 (11th Cir. 2004). All relevant evidence must be considered, including his ability to relocate and human rights violations within the country. 8 C.F.R. § 1208.16(c)(3). Pursuant to 8 C.F.R. § 1208.18(a)(1), "torture" is defined as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person

has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity.

To acquiesce, an official must, before the torture: (1) actually know of the torture, or be aware of its high probability and deliberately avoid learning the truth, and (2) breach his legal responsibility to intervene. *Id.* § 1208.18(a)(7). Officials do not acquiesce under the CAT if they intervene but are unsuccessful. *See Sanchez-Castro v. U.S. Att'y Gen.*, 998 F.3d 1283, 1288 (11th Cir. 2021) ("[E]ven if [a petitioner] were right that the police are not effective at controlling [organized crime], it is dispositive that they are trying to do so."); *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1243 (11th Cir. 2004) ("That the police did not catch the culprits does not mean that they acquiesced in the harm.").

A motion to reopen "shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits or other evidentiary material." INA § 240(c)(7)(A), (B), 8 U.S.C. § 1229a(c)(7)(A), (B); *Verano-Velasco v. U.S. Att'y Gen.*, 456 F.3d 1372, 1376 (11th Cir. 2006). Motions to reopen may be granted if there is new evidence that "is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. §§ 1003.2(c)(1), 1003.23(b)(3). Evidence is "new" if it was unavailable or could not

have been presented before the IJ. *Verano-Velasco*, 456 F.3d at 1377. In addition, a petitioner must present new evidence that would likely change the outcome if proceedings before the IJ were reopened. *Ali v. U.S. Att'y Gen.*, 443 F.3d 804, 813 (11th Cir. 2006). The BIA may deny a motion to reopen on any of three independent grounds: "failure to establish a prima facie case for the relief sought, failure to introduce previously unavailable, material evidence, and a determination that even if these requirements were satisfied, the movant would not be entitled to the discretionary grant of relief which he sought." *I.N.S. v. Doherty*, 502 U.S. 314, 323 (1992).

If a motion to reopen is based on ineffective assistance of counsel, the movant must show, "substantial, if not exact compliance with the procedural requirements of [*Matter of*] *Lozada*," and that "his counsel's deficient representations resulted in prejudice to him." *Dakane v. U.S. Att'y Gen.*, 399 F.3d 1269, 1274 (11th Cir. 2005). To show prejudice, a movant must show that "the performance of counsel is so inadequate that there is a reasonable probability that but for the attorney's error, the outcome of the proceedings would have been different." *Id.*

We conclude that Manbru-Encarnacion has not shown the BIA abused its discretion in denying his motion to reopen. The evidence Manbru-Encarnacion submitted to the agency in his motion to reopen falls into two categories: first, evidence that had not previously been before the agency—"new" evidence—and, second, evidence submitted with the motion to reopen that was identical or substantially similar to the evidence the IJ had considered

in denying Manbru-Encarnacion's application for CAT relief in the first instance. We address these two categories of evidence in turn and then address his ineffective assistance argument.

As to the evidence that Manbru-Encarnacion presented in his motion to reopen that was new, we cannot conclude that the BIA abused its discretion. Specifically, this evidence did not show a link between TWC and the government of the Dominican Republic sufficient to show acquiescence. *See* 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(7). The letter from the FBI does not show a link between TWC and the Dominican government, as the letter only indicates that Manbru-Encarnacion could be exposed to harm should he be deported. The letter from Manbru-Encarnacion's ex-wife, while also new, covers much of the same ground as the evidence submitted previously to the IJ. Thus, the BIA did not abuse its discretion in concluding that this new evidence would not have likely changed the result of the proceedings, *Ali*, 443 F.3d at 813, because it is still insufficient to prove that the Dominican government has a relationship with TWC such that it would acquiesce to his torture, *Sanchez-Castro*, 998 F.3d at 1288; *Reyes-Sanchez*, 369 F.3d at 1243. Without this relationship element satisfied, further development of this claim would not have changed the outcome. *Cf. Matter of L-O-G-*, 21 I. & N. Dec. 413, 420 (BIA 1996) (stating, in reviewing a motion to reopen, the question is "whether there is sufficient evidence proffered to indicate a reasonable likelihood of success on the merits, so as to make it worthwhile to develop the issues further at a full evidentiary hearing").

The second category of evidence Manbru-Encarnacion submitted with his motion to reopen—evidence that was identical or substantially similar to the evidence the IJ considered in denying his application for CAT relief in the first instance—also does not show the BIA abused its discretion. This evidence was not "new," as is necessary to support a motion to reopen under BIA regulations. 8 C.F.R. §§ 1003.2(c)(1), 1003.23(b)(3); *Verano-Velsaco*, 456 F.3d at 1376-77 (explaining that evidence is "new" when it "was unavailable at the time of [the petitioner's] previous hearing"). Moreover, because the IJ and BIA had considered substantially similar evidence during the initial denial and found it did not show Manbru-Encarnacion's entitlement to CAT relief, the consideration of it again was unlikely to change the outcome either. *See Ali*, 443 F.3d at 813.

We also conclude that Manbru-Encarnacion's ineffective assistance argument is unavailing.[3] For many of the same reasons we have discussed, Manbru-Encarnacion has not established that he was prejudiced by his counsel's alleged deficiencies. *See Dakane*, 399 F.3d at 1274 ("Prejudice exists when the performance of counsel is so inadequate that there is a reasonable probability that but

---

[3] In ruling on his motion to reopen, the BIA determined that Manbru-Encarnacion had satisfied the procedural requirements of *Matter of Lozada*, but that he had not shown prejudice from any deficiency of his attorney. We, similarly, need not address the procedural requirements of *Matter of Lozada*, as we agree with the BIA's holding on prejudice. *See INS v. Bagamasbad*, 429 U.S. 24, 25-26 (1976) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

for the attorney's error, the outcome of the proceedings would have been different."). Even after Manbru-Encarnacion's original counsel withdrew, he had the opportunity to enter more evidence before the IJ issued a written decision and in his first administrative appeal. Then, Manbru-Encarnacion had the opportunity to submit more evidence in his motion to reopen. Given that Manbru-Encarnacion has not shown that all of the evidence submitted—during his administrative appeal and during his motion to reopen—establish that he is entitled to CAT relief, counsel's failure to obtain and submit that evidence in Manbru-Encarnacion's initial proceedings before the IJ did not alter the outcome of the proceedings. *Id.* For the same reasons, counsel's failure to direct and elicit testimony during the hearing would not have altered the outcome of the proceedings, as Manbru-Encarnacion was afforded opportunities to supplement his testimony, did so, and that evidence was found insufficient. We, thus, cannot say the BIA abused its discretion in finding that Manbru-Encarnacion did not suffer prejudice from his attorney's performance.

## IV. CONCLUSION

For these reasons, we conclude that Manbru-Encarnacion has not shown that the BIA abused its discretion in denying his motion to reopen. Accordingly, we deny his petition for review.

**PETITION DENIED.**